JUDGE CASTEL

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRANK ERICKSON, Individually and On Behalf of All Others Similarly Situated, | Case No. **13 CV 4308** |
| Plaintiff, | **CLASS ACTION** |
| v. | |
| CORINTHIAN COLLEGES, INC., JACK P. MASSIMINO, ROBERT C. OWEN, and KENNETH S. ORD, | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

RECEIVED JUN 20 2013 U.S.D.C. S.D. N.Y. CASHIERS

Plaintiff Frank Erickson ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Corinthian Colleges, Inc. ("Corinthian" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Corinthian securities

between August 23, 2011 and June 10, 2013, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 10b-5 promulgated thereunder against the Company and certain of its top officials and/or directors.

2.     Corinthian is a publicly traded, for-profit education company headquartered in Santa Ana, CA. Corinthian operates a total of 105 campuses in 25 States, along with an online division, and offers diploma and degree programs in health care, business, criminal justice, transportation technology and maintenance, construction trades, and information technology. Approximately 34 percent of Corinthian students are enrolled online, and 64 percent are enrolled in diploma (non-degree) programs.

3.     The Company derives over 80% of its revenues from federal education funds, such as the Pell grant and Stafford loan programs, which assist students in paying for higher education programs. Between 2007 and 2010, the Company tripled the amount of Pell grants it collects, from 170.2 million in 2007 to $509.3 million in 2010.

4.     Because many students drop out of Corinthian's student programs, enrollment growth is critical to the success of the Company. In order to meet revenue and profit expectations, Corinthian recruits as many students as possible to enroll in its programs.

5.     In 2008, the Company created its alternative lending program, as the financial crisis was peaking and after private lenders stopped making loans to Corinthian students.

6.     The alternative lending program helps keep Corinthian from running afoul of the so-called "90/10 Rule," a government regulation enacted in October 1999, that requires for profit

colleges such as Corinthian, to ensure that at least 10% of their revenues comes from non-state financial aid sources, such as Pell Grants or Stafford loans.

7.     On August 3, 2010 the United States Government Accountability Office ("GAO") issued a report concluding that for-profit educational colleges such as Corinthian had engaged in an illegal and fraudulent course of action designed to recruit students and overcharge the federal government for the cost of such education. Thereafter, a Congressional Committee launched an investigation of such practices; the U.S. Department of Education released data showing that the loan repayment rates for Corinthian enrollees were well below the level required for federal loan program eligibility; and the Company disclosed that its enrollee default rates had significantly increased.

8.     Over the course of the following two years, and in response to the GAO report and Congressional investigation, several state authorities began investigating the Company, including the Attorney General's Office for the states of Massachusetts, Georgia, New York, Oregon, and Illinois; as well as the United States Consumer Financial Protection Bureau.

9.     In response to reports of similar misconduct by other for-profit education companies, in June 2011, President Obama released final regulations requiring for profit colleges such as Corinthian to better prepare students for gainful employment or risk losing access to Federal student aid. Under the new gainful employment regulations:

> [A] program would be considered to lead to gainful employment if it meets at least one of the following three metrics: at least 35 percent of former students are repaying their loans (defined as reducing the loan balance by at least $1); the estimated annual loan payment of a typical graduate does not exceed 30 percent of his or her discretionary income; or the estimated annual loan payment of a typical graduate does not exceed 12 percent of his or her total earnings.

3

10. Throughout the Class Period, the Company continually touted its compliance with these new regulations, stating that, "[o]n *the regulatory front, we continued to implement policies and procedures in response to new federal regulations and remained focused on compliance.*"

11. Despite these representations, the compliance efforts of the Company, including the default management program, served only to perpetuate the inherent issues with the Company's high student default rates and low graduation and gainful employment statistics. The Company's compliance measures were in fact nothing more than a small bandage over a deep and festering wound, which jeopardized the Company's core operational health.

12. On July 30, 2012, Senator Tom Harkin, chairman of the Health, Education, Labor and Pensions Committee completed a two-year investigation of the for-profit college industry, and issued a report (the, "Harkin Report") filled with troubling statistics and findings regarding the for profit college industry, and specifically about Corinthian.

13. After the Harkin Report was published the Company's shares fell 6.4% or $0.12 to close at $1.89 on July 30, 2012.

14. According to the Harkin Report, the Company's aggressive lending and recruiting practices resulted in a student body that is underprepared for college, generally unable to obtain gainful employment, and laden with a significant amount of debt. Indeed, the Company's student population has one of the highest default rates in the country, according to a study cited by a United States Senate committee report, and is at risk of losing its eligibility for Federal financial aid as a result of its extremely high default rate. The report stated:

> Corinthian's default rate has similarly increased, growing from 22.9 percent for students entering repayment in 2005 to 36.1 percent for students entering repayment in 2008.1569 This is by far the highest default rate of any publicly traded company examined, and the second highest overall.1570 The default rate is 64 percent higher than the rate for all for-profit colleges. While the company's high default rate is likely due in part

4

to the high cost of Corinthian' programs, it also raises serious questions regarding the quality of the programs Corinthian provides, and whether its students who complete programs earn high enough wages to repay the debt they take on. Had the 3-year cohort default rate provision been in effect in 2011, Corinthian would have faced the loss of access to title IV financial aid dollars.

15.     Also, according to the Harkin Report, in response to the rising default rate of its student borrowers, the Company began a series of "default management" programs in an attempt to prevent revocation of Corinthian's Federal financial aid eligibility. The default management program however did not actually solve the issue of loan defaults, but instead placed student loans on deferment and forbearance, to allow the Company to account for these loans as performing and not in default, thus maintaining the appearance of compliance with federal regulations. The report stated:

> Corinthian has focused significant resources on finding ways to eliminate students from its reported default rates. Helping get delinquent students into repayment, deferment, or forbearance prior to default is encouraged by the Department of Education. However, many for-profit colleges appear to be investing in aggressive tactics for the sole purpose of ensuring that borrowers do not default within the 3-year regulatory window.

> Default management is primarily accomplished by putting students who have not made payments on their student loans into temporary deferments or forbearances. While the use of deferment and forbearance is fairly widespread throughout the sector, documents produced indicate that a number of companies also pursue default management strategies that include loan counseling, education, and alternative repayment options. Default management contractors are paid to counsel students into repayment options that ensure that students default outside the 2-year, soon to be 3-year, statutory window in which the Department of Education monitors defaults.

16.     The Harkin Report criticizes the deferment and forbearance programs as especially detrimental to the long term prospects of students, as these programs usually have negative long term financial consequences for the student-borrower, who will incur larger long

term borrowing costs, while the Company can report lower student default rate and offer a rosier

picture to investors and federal regulators. The report concluded:

> Evidence suggests that some for-profit colleges use forbearance and
> deferment as tools to move the school's default rate, without concern for a
> students' particular situation or whether it is in the best financial interest
> of the individual. Many students will end up paying more over the life of
> their loan after a forbearance or deferment.

17.     In addition to issues with the Company's lending practices, the Harkin Report

also disclosed an undercover investigation conducted by the GAO, which revealed serious

concerns regarding the academic quality of Corinthian's programs. The GAO investigation found

that the Company had very low academic standards, finding that there was very little interaction

between students and teachers, and that plagiarism and other academic misconduct was not

corrected by Corinthian faculty.

18.     Throughout the Class Period, Defendants made materially false and misleading

statements regarding the Company's business, operational and compliance policies. Specifically,

Defendants made false and/or misleading statements and/or failed to disclose that: (i) defendants

manipulated federal student loan and grant programs in order to appear to be in compliance with

new federal regulations enacted in June 2011; (ii) defendants' predatory and deceptive recruiting

and enrollment practices violated federal regulations enacted beginning in June 2011; and (iii)

the Company engaged in systemic grade falsification at the Company's campuses in order to

appear to be in conformance with the new regulations enacted beginning in 2011.

19.     On June 10, 2013, the Company disclosed that the SEC was conducting an

investigation into the company, and that the SEC has requested documents and communications

related to student recruitment, attendance, completion, placement, defaults on loans, along with

information on other corporate and financial matters.

20.     On this news, Corinthian securities declined $0.32 per share or nearly 11.47%, to close at $2.47 per share on June 11, 2013.

21.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

22.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n(a) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5, 17 C.F.R. § 240.14a-9).

23.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

24.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as Corinthian's securities are traded within this District.

25.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

26.     Plaintiff, as set forth in the attached Certification, acquired Corinthian securities at artificially inflated prices during the Class Period and has been damaged thereby.

27.     Defendant Corinthian is a Delaware corporation with its principal executive offices located at 6 Hutton Centre Drive, Santa Ana, CA 92707.  Corinthian's common stock trades on the NASDAQ under the ticker symbol "COCO."

7

28.     Defendant Jack Massimino ("Massimino") is the Company's Chairman and Chief Executive Officer ("CEO").

29.     Defendant Robert C. Owen ("Owen") served as the Company's Executive Vice-President and Chief Accounting Officer from July 2011 through September 2011, and as Executive Vice-President and Chief Financial Officer from September 2011 to the present.

30.     Defendant Kenneth S. Ord ("Ord") has served as the Company's Executive Vice-President, Chief Administrative Officer and Chief Financial Officer during the Class Period.

31.     The defendants referenced above in ¶¶ 26-30 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS
### Background

32.     Corinthian is a publicly traded, for-profit education company headquartered in Santa Ana, CA. Corinthian operates a total of 105 campuses in 25 States, along with an online division, and offers diploma and degree programs in health care, business, criminal justice, transportation technology and maintenance, construction trades, and information technology. Approximately 34 percent of Corinthian students are enrolled online, and 64 percent are enrolled in diploma (non-degree) programs.

### Materially False and Misleading
### Statements Issued During the Class Period

33.     On August 23, 2011, the Company issued a press release announcing fiscal 2011 Fourth Quarter and Annual Results, and reported fourth quarter net revenue of $425.2 million, total student population of 93,457, total new students of 24,981, operating income of $6.7 million and net income of $3.4 million or $0.05 per share. The Company also reported annual revenues of $1.87 billion and a net loss of $111 million or $1.28 per share.

8

34.     In the August 23, 2011 press release the Company also stated:

> We navigated through a number of challenges in fiscal 2011 and made
> progress in several areas," said Jack Massimino, Corinthian chairman and
> chief executive officer. "We continued to focus on student completion,
> and we assisted a record number of graduates in finding jobs in their fields
> of study. *In the area of regulatory compliance, we developed and
> implemented a new compensation program for front-line admissions and
> student finance representatives and expanded our disclosures related to
> completion, placement and program costs. We took steps to remain in
> compliance with the 90/10 Rule, including a new external student
> financing program.* We also continued to increase the efficiency of our
> back-end operations, particularly in the area of cohort default management
> and financial aid processing. As a result, we no longer consider two-year
> CDRs to be a significant risk for our company.

(Emphasis added.)

35.     On August 24, 2011 the Company filed an annual report for the period ended June

30, 2011 on a Form 10-K with the SEC signed by, among others, the Individual Defendants and

where it reiterated the Company's previously reported financial results and financial position.

36.     In the Company's August 24, 2011 10-K, the Company also stated the following

regarding its compliance efforts:

> During the year, we took steps to remain in compliance with the 90/10
> Rule, which requires no more than 90 percent of revenue be derived from
> Title IV funds. We implemented tuition increases and established a team
> dedicated to the pursuit of non-Title IV revenue. We also reached an
> agreement with ASFG, LLC to provide up to $450 million in gap
> financing for our students over two years.
>
> ***
>
> As of June 30, 2011, we employed approximately 2,400 admissions
> representatives who work directly with prospective students to facilitate
> the admissions process. These representatives interview and advise
> students interested in specific careers and are a key component of our
> effort to generate interest in our educational services. We conduct semi-
> annual student satisfaction surveys at our campuses in the United States in
> which students have consistently given high marks to our admissions
> personnel for helpfulness, courtesy and accuracy of information. Because
> our success is highly dependent on the efficiency and effectiveness of our
> admissions process, we invest considerable resources to train our

9

admissions representatives in product knowledge, regulatory compliance, and customer service. We also employ various admissions supervisory and monitoring programs, and conduct student surveys which help us ensure compliance with both government regulations and our corporate policies.

\*\*\*

As required by their respective regional accrediting agencies, Everest College Phoenix and Heald College are overseen by boards of trustees that include a majority of independent members who review academic integrity and autonomy of the institutions. These governing boards have broad oversight over the schools' programs and operations, set the strategic direction for the institutions, play an active role in policy-making, and review financial resources of their schools to ensure the institution is able to provide a sound educational program. In furtherance of that mission, each board of trustees develops policies appropriate to the needs of the school and works closely with the respective schools' administrations to, among other things, establish a climate for articulating and promoting the educational vision of the schools.

\*\*\*

In addition to the program integrity issues specifically addressed above, the final regulations issued by ED on October 29, 2010 include provisions regarding the types of statements by an institution or parties related to an institution that constitute prohibited misrepresentation; written agreements between institutions, particularly institutions under common ownership or control; the administration of ability-to-benefit examinations; requirements regarding an institution's return of Title IV program funds; and certain other issues pertaining to a student's eligibility to receive Title IV program funds. We have modified many of our practices as a result of the final regulations issued on October 29, 2010.

\*\*\*

In order to improve our overall default rates, we have implemented a multi-faceted cohort default prevention program. This program includes the following: a contact management system to assist in reaching students who are no longer in school; an internal department focused primarily on early stage delinquencies; an expanded program of entrance and exit counseling and financial literacy training for current students; and the use of outside firms and internal resources to reach borrowers and assist them in contacting their lenders and getting help with alternatives to default, including income-based repayment, deferral and forbearance.

\*\*\*

Under certain circumstances, an institution may elect to admit non-high school graduates into certain of its programs of study. In such instances, the institution must demonstrate that the student has the "ability to benefit"

10

from the program of study. The basic evaluation method to determine that a student has the ability to benefit from the program is the student's achievement of a minimum score on a test approved by the ED and independently administered in accordance with ED regulations. In addition to the testing requirements, the ED regulations prohibit enrollment of ATB students from constituting 50% or more of the total enrollment of the institution to qualify for Title IV funding. None of our colleges that accept ATB students has an ATB enrollment population that exceeds 50% of the total enrolled population. As of June 30, 2011, ATB students represented approximately 4.3% of our total student population, down from 15.1% at June 30, 2010.

37.      On November 1, 2011, the Company issued a press release announcing fiscal 2012 First Quarter Results, and reported net revenue of $414 million, total student population of 94,083, total new students of 31,624, operating loss of $3 million and a net loss of $3.8 million or $0.11 per share.

38.      On November 3, 2011, the Company filed a quarterly report for the period ended September 30, 2011 on a Form 10-Q with the SEC signed by, among others, the Individual Defendants and where it reiterated the Company's previously reported financial results and financial position.

39.      On February 1, 2012, the Company issued a press release announcing fiscal 2012 Second Quarter Results, and reported net revenue of $415.5 million, total student population of 94,860, total new students of 25,951, operating income of $10 million and net income of $3.4 million or $0.02 per share.

40.      In the February 1, 2012 press release, the Company stated:

"To help offset recent declines in student population, over the past 18 months we have reduced annualized operating expenses by approximately $150 million," Massimino said. "We also continue to pursue several growth initiatives, such as introducing new program offerings, opening new campuses, and growing our exclusively online enrollments."

41.     On February 2, 2012, the Company filed a quarterly report for the period ended December 31, 2011 on a Form 10-Q with the SEC signed by, among others, the Individual Defendants and where it reiterated the Company's previously reported financial results and financial position.

42.     On May 3, 2012, the Company issued a press release announcing fiscal 2012 Third Quarter Results, and reported net revenue of $424.1 million, total student population of 96,631, total new students of 29,427, operating income of $26.1 million and net income of $0.11 per share.

43.     In the May 3, 2012 press release, the Company stated:

> "As anticipated, our new student enrollment growth improved in the third quarter this year compared to the same quarter last year, "Massimino said. The improvement is the result of several factors, including gradual stabilization in ground school new enrollments, continued strong growth at Everest University Online, and a less challenging comparison to the third quarter last year. We expect the rate of new enrollment growth to remain positive in the fourth quarter."

44.     On May 4, 2012, the Company filed a quarterly report for the period ended March 31, 2012 on a Form 10-Q with the SEC signed by, among others, the Individual Defendants and where it reiterated the Company's previously reported financial results and financial position.

45.     In its May 4, 2012 report, the Company disclosed that it was subject to several investigations and potential litigation with several government authorities:

> On March 28, 2011, the Company received a letter from the California Attorney General's Office (the "CA AG") ostensibly seeking information pursuant to the Stipulated Judgment agreed to by the Company and the CA AG in July 2007. The letter requests information and documentation related to (i) the discontinuation of certain programs immediately after the Stipulated Judgment, (ii) numbers of new students, graduating students and discontinuing students, by program, (iii) marketing and solicitation materials, (iv) enrollment agreements and disclosures, (v) graduating students' employment and compensation, (vi) transferability of credit by the Company's former students, (vii) training provided to employees

12

pursuant to the Stipulated Judgment, and (viii) disciplinary actions against certain categories of employees. The Company has cooperated, and continues to cooperate, with the CA AG's reasonable requests for information, but has objected to certain overly-broad requests which appear to be unrelated to the 2007 Stipulated Judgment.

On April 29, 2011, the Company's Everest Institute campuses in Brighton and Chelsea, Massachusetts received civil investigative demands from the Massachusetts Attorney General's Office (the "MA AG") seeking (i) information about past students who have enrolled in each institution, (ii) the identity of recruiters, (iii) recruiting and enrollment documents, (iv) documentation related to analyses of delinquency, default, drop out, refund, loan forgiveness or reduction, placement, student income, and/or any student's ability to repay loans, and (v) cohort default and graduation rates. The Company has cooperated, and continues to cooperate, with the MA AG's reasonable requests for information.

On April 11, 2011 the Company's Everest Institute in Jonesboro, Georgia was sent a subpoena from the Atlanta office of ED's Office of Inspector General (the "OIG") requesting documents related to the Jonesboro campus's employment and placement rates reported to its accrediting agency, as well as correspondence with the accrediting agency. The Company has become aware that this matter is being supervised by an Assistant United States Attorney for the Northern District of Georgia who focuses primarily on civil false claims act matters, including *qui tams*. The Company does not know whether a *qui tam* action has been filed under seal or whether the United States Attorney's Office has made a determination about whether to file a false claims act lawsuit in this matter. The Company has provided documents to the OIG, met with the OIG and the AUSA supervising this matter, and is continuing to cooperate with the OIG's requests.

On May 19, 2011, along with other private sector education companies, the Company received a subpoena from the New York Attorney General's Office (the "NY AG") seeking information on potential issues related to financial aid, admissions, students, securities and other areas. The Company is cooperating with the NY AG's reasonable requests for information.

On July 19, 2011, the Company's attorneys met with representatives of the Oregon Attorney General's Office ("OR AG") in anticipation of a written request for information related to the Company's Everest Institute campus in Tigard, Oregon and the Everest College and Heald College campuses in Portland, Oregon. The Company was informed that the investigation is not the result of student complaints regarding the campuses. On August 11, 2011, the Company received a civil investigative demand from the Oregon

Attorney General's Office requesting information and documents regarding advertising; student recruitment; admissions; licensure and accreditation; compensation, training and evaluations of admissions personnel; job opportunities and placements of graduates; student complaints; and various other matters. The Company has cooperated and continues to cooperate with the OR AG's reasonable requests for information.

On December 15, 2011, after other private sector education companies had received similar requests, the Company received a civil investigative demand from the Illinois Attorney General's Office (the "IL AG") seeking information on potential issues related to financial aid, admissions, students and other areas. The Company is cooperating with the IL AG's reasonable requests for information.

On April 3, 2012, the Company was served with a Civil Investigative Demand ("CID") from the U.S. Consumer Financial Protection Bureau ("CFPB"). The CID stated that its purpose is to "determine whether for-profit postsecondary companies, student loan origination and servicing providers, or other unnamed persons, have engaged or are engaging in unlawful acts or practices relating to the advertising, marketing, or origination of private student loans." The CID contains extensive interrogatories and document production demands related to the Company's involvement with student loans and many other aspects of the Company's business. The Company has contacted the CFPB regarding the CID and has retained outside counsel to assist it in this matter. The Company expects to provide documents and other information to the CFPB, while also preserving its rights to object to the inquiry. The Company believes that its acts and practices relating to student loans are lawful and essential to preserving our students' access to post-secondary education.

46.     On August 20, 2012, the Company issued a press release announcing fiscal 2012 Fourth Quarter and Annual Results, and reported fourth quarter net revenue of $394.8 million, total student population of 91,460, total new students of 25,839, operating income of $16.4 million and a net loss of $6.5 million. The Company also reported annual revenues of $1.6 billion and a net loss of $10.2 million or $0.12 per share.

47.     Also on August 20, 2012, the Company held a conference call with investors to discuss the quarterly and annual results for the recently ended period, during that call Defendant

Massimino stated:

> "We made considerable operational progress in fiscal 2012 while continuing our transition to new federal regulations," said Jack Massimino Corinthian chairman and chief executive officer. "In light of this challenging economic environment, we're very pleased to report that more than two-thirds of our nearly 49,000 graduates in calendar year 2011 found jobs in the fields for which they were trained. We implemented policies and procedures in response to new regulatory requirements in a number of areas, primarily marketing, admissions, and student finance. *We continued to focus on improving the student value proposition while complying with the 90/10 Rule.* For students who graduated in calendar 2011, 68.1% or more than 33,000 graduates found employment in their fields of study. This is up slightly from 67.6% in the previous year, and the current run rate for calendar 2012 grads is higher than in 2011. We're making the transition to new federal regulations and remain focused on compliance. *We have a number of initiatives in place to help address the loss of ability-to-benefit students and generate positive new enrollment growth beginning in the back half of fiscal 2013.*"

(Emphasis added.)

48.    In the August 23, 2011 press release the Company also stated:

> "Fiscal 2012 was a year of progress against a backdrop of adapting to regulatory change," said Jack Massimino, Corinthian chairman and chief executive officer. "*We continued to focus on student completion and achieved a slight increase in our graduate placement rate despite a weak economy.* We reduced operating expenses to align with our lower student population and took steps to close or sell nine underperforming campuses. We strengthened our financial position by renewing our line of credit on favorable terms, completing a sale-leaseback of five Heald facilities, and extending by two years our student lending agreement with ASFG. We continued to increase the efficiency of our back-end operations by completing the implementation of our common student information system at Heald. We brought student financial aid processing in-house and substantially reduced bad debt as a percent of revenue. We also made progress in cohort default prevention and as a result, no longer consider two-year or three-year cohort default rates to pose an immediate risk to our company. *On the regulatory front, we continued to implement policies and procedures in response to new federal regulations and remained focused on compliance.*"

(Emphasis Added.)

15

49.    On August 24, 2012 the Company filed an annual report for the period ended June 30, 2012 on a Form 10-K with the SEC signed by, among others, the Individual Defendants and where it reiterated the Company's previously reported financial results and financial position.

50.    In its August 24, 2012 10-K, the Company stated the following regarding its compliance efforts:

> As of June 30, 2012, we employed approximately 2,380 admissions representatives who work directly with prospective students to facilitate the admissions process. These representatives interview and advise students interested in specific careers and are a key component of our effort to generate interest in our educational services. We conduct semi-annual student satisfaction surveys at our campuses in the United States in which students have consistently given high marks to our admissions personnel for helpfulness, courtesy and accuracy of information. Because our success is highly dependent on the efficiency and effectiveness of our admissions process, we invest considerable resources to train our admissions representatives in product knowledge, regulatory compliance, and customer service. We also employ various admissions supervisory and monitoring programs, and conduct student surveys which help us ensure compliance with both government regulations and our corporate policies.

***

> Under a provision of the HEA commonly referred to as the "90/10 Rule," a private, for-profit institution, such as each of our institutions, would cease being eligible to participate in the Title IV Programs if, on a cash accounting basis, more than 90% of its revenue was derived from the Title IV Programs. Prior to the enactment of the HEOA, any institution that violated the 90/10 Rule immediately became ineligible to participate in the Title IV Programs and was unable to apply to regain its eligibility until the following fiscal year. Under the HEOA, an institution will not become ineligible until it has exceeded the 90% maximum for two consecutive fiscal years. These changes will afford our institutions additional flexibility in meeting the 90/10 Rule. The legislation, however, also provides that institutions that exceed the 90% limit may be placed on provisional certification and be subject to additional monitoring and that those which violate the 90/10 Rule will be ineligible for two fiscal years before they regain eligibility.

> For purposes of calculating compliance with the 90/10 Rule under the HEOA, an institution is permitted, for a limited period of time, to count institutional loans as non-Title IV revenue. This provision expired on July

1, 2012. Under these modified 90/10 calculations for the 2012 fiscal year, our institutions derived between 62.8% and 94.1% of their revenues (on a modified cash basis) from Title IV programs. Two of our total 49 institutions (including five institutions in discontinued operations) exceeded the 90% threshold in fiscal 2012, ECP at 94.1% and Everest University in Tampa, FL at 92.4%. Combined, these institutions had 10,550 students at June 30, 2012. On August 14, 2012 we notified ED that these two institutions had 90/10 rates above 90% for the 2012 fiscal year.

\*\*\*

All institutions participating in the Title IV Programs must satisfy a series of specific standards of financial responsibility. Institutions are evaluated for compliance with those requirements in several circumstances, including as part of ED's recertification process and also annually as each institution submits its audited financial statements to ED. As part of the evaluation of an institution's financial responsibility, ED calculates three financial ratios for an institution: an equity ratio, a primary reserve ratio, and a net income ratio. Each ratio is scored separately and then combined to determine the institution's financial responsibility. If an institution's composite score is below the minimum requirement for unconditional approval (which is a score of 1.5) but within a designated threshold level (the ''Zone,'' which is 1.0 to 1.4), such institution may take advantage of an alternative that allows it to continue to participate in the Title IV Programs for up to three years under additional monitoring and reporting procedures but without having to post a letter of credit in favor of ED. If an institution's composite score falls below the minimum threshold level of 1.0 or is in the Zone for more than three consecutive years, the institution may be required to post a letter of credit in favor of ED.

For fiscal 2012, the Company, on a consolidated basis, meets the requirements with a composite score of 1.5. We believe our calculations of the financial responsibility score are correct, however the calculation is subject to interpretive issues. If ED were to take a different interpretive position than we have with regard to this calculation, it could negatively impact the Company's composite score on a consolidated basis.

51.    On October 31, 2012, the Company issued a press release announcing fiscal 2013 First Quarter Results, and reported net revenue of $408.6 million, total student population of 92,070, total new students of 31,458, operating income of $10.5 million and net loss of $0.07 per share.

17

52.     On November 1, 2012, the Company filed a quarterly report for the period ended September 30, 2012 on a Form 10-Q with the SEC signed by, among others, the Individual Defendants and where it reiterated the Company's previously reported financial results and financial position.

53.     On January 31, 2013, the Company issued a press release announcing fiscal 2013 Second Quarter Results, and reported net revenue of $409.7 million, total student population of 88,688, total new students of 23,703, and operating income of $14.1 million.

54.     Also on January 31, 2013, the Company held a conference call with investors to discuss the results from the recently ended period, and during that conference call the Company stated:

> "I think you all know we've transitioned both online and Heald into full-time – an opportunity for full-time pricing and if the students went to school full-time the discount, if they didn't go to school full-time the tuition actually went up a little bit," said Jack Massimino, Corinthian chairman and chief executive officer. "We are trying to move students more into the full-time arena. As a result of doing that we saw spike in attrition both in the online arena as well as Heald. Our expectation is that should start to come down over the course of the next several quarters. It was an event that took place over the course of the last six months or so. In addition we continue to pursue other alternatives to generate new enrollment growth. As I said earlier, we've made tuition pricing changes and interest rate reductions on third party student loans. These actions appear to be having a positive effect, although it is too soon to gauge the full impact. In October we began the roll-out of our new diploma programs in areas of business, criminal justice, and information technology. We expect the bulk of new diploma programs slated for this year to occur in a second half."

55.     On February 1, 2013, the Company filed a quarterly report for the period ended December 31, 2012 on a Form 10-Q with the SEC signed by, among others, the Individual Defendants and where it reiterated the Company's previously reported financial results and financial position.

56.     On April 30, 2013, the Company issued a press release announcing fiscal 2013 Third Quarter Results, and reported net revenue of $400.2 million, total student population of 87,776, total new students of 26,738, and operating income of $12.6 million.

57.     Also on April 30, 2013, the Company held a conference call with investors to discuss the results from the recently ended period, and during that conference call the Company stated:

> Looking ahead, we expect new enrollment in the fourth quarter to be down 3% to 5% compared to the same period last year. The main reason for the decrease is the loss of ATB students. In the fourth quarter of last year we enrolled approximately 2,949 ATB students. In the fourth quarter this fiscal year, we expect to enroll approximately 325 ATB students. In terms of non-ATB students, we expect new enrollment to be up by approximately 7% to 9%. For the fiscal year we expect total new enrollment growth to be down approximately 2% versus the prior year, however, we do expect non-ATB new enrollment to be up by approximately 5% for the fiscal year. As we reported in an 8-K on March 25, the weighted average for our institutions was 19%, well below the federal threshold of 30% and 9.2 percentage points below the 28.2% reported for the preliminary three-year measurement of the 2009 cohort. *We've achieved this improvement in part by establishing a robust, in-house cohort default defensive program. Our program includes financial literacy training provided to students while they are in school, counseling related to repayment options and early intervention in the default process.*

(Emphasis Added.)

58.     On April 30, 2013, the Company filed a quarterly report for the period ended March 31, 2013 on a Form 10-Q with the SEC signed by, among others, the Individual Defendants and where it reiterated the Company's previously reported financial results and financial position.

59.     The statements referenced in ¶¶ 33-58 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including:     (i) defendants

manipulated federal student loan and grant programs in order to appear to be in compliance with new federal regulations enacted beginning in June 2011; (ii) defendants' predatory and deceptive recruiting and enrollment practices violated federal regulations enacted beginning in June 2011; and (iii) the Company engaged in systemic grade falsification at the Company's campuses in order to appear to be in conformance with the new regulations enacted beginning in 2011.

## THE TRUTH EMERGES

60.     On June 10, 2013, the Company issued a press release disclosing:

> On June 6, 2013, Corinthian Colleges, Inc. (the "Company") received a subpoena from the Securities and Exchange Commission ("SEC"). In a letter accompanying the subpoena, the SEC stated that it is conducting an investigation of the Company. The SEC's subpoena requests the production of documents and communications that, among other things, relate to student information in the areas of recruitment, attendance, completion, placement, defaults on federal loans and on alternative loans, as well as compliance with U.S. Department of Education financial requirements, standards and ratios (including the effect of certain borrowings under the Company's credit facility on the Company's composite score, and 90/10 compliance), and other corporate, operational, financial and accounting matters. The Company intends to cooperate with the SEC in its investigation.

61.     The Company failed to reveal to investors that its compliance programs were in fact not working, and the Company was subject to liability from government authorities and at risk of losing essential Federal financial aid dollars, which accounted for over 80% of the Company's revenues.

62.     On this news, Corinthian securities declined $0.32 per share or nearly 11.47%, to close at $2.47 per share on June 11, 2013.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Corinthian securities during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

64.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Corinthian securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Corinthian or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

65.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

66.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

67.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Corinthian;

- whether the Individual Defendants caused Corinthian to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Corinthian securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

68.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

69.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

22

- Corinthian securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Corinthian securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

70.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)

71.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

72.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

73.    During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to,

and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Corinthian securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Corinthian securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

74.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Corinthian securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Corinthian's finances and business prospects.

75.    By virtue of their positions at Corinthian, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

76.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Corinthian, the Individual Defendants had knowledge of the details of Corinthian's internal affairs.

77.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Corinthian.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Corinthian's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Corinthian securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Corinthian's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Corinthian securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

78.     During the Class Period, Corinthian securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Corinthian securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or

otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Corinthian securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Corinthian securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

79.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

80.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

81.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

82.     During the Class Period, the Individual Defendants participated in the operation and management of Corinthian, and conducted and participated, directly and indirectly, in the conduct of Corinthian's business affairs. Because of their senior positions, they knew the

adverse non-public information about Corinthian's misstatement of income and expenses and false financial statements.

83.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Corinthian's financial condition and results of operations, and to correct promptly any public statements issued by Corinthian which had become materially false or misleading.

84.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Corinthian disseminated in the marketplace during the Class Period concerning Corinthian's results of operations.    Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Corinthian to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Corinthian within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Corinthian securities.

85.     Each of the Individual Defendants, therefore, acted as a controlling person of Corinthian.    By reason of their senior management positions and/or being directors of Corinthian, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Corinthian to engage in the unlawful acts and conduct complained of herein.   Each of the Individual Defendants exercised control over the general operations of Corinthian and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

86.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Corinthian.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:   June 20, 2013

Respectfully submitted,

POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS LLP

Jeremy A. Lieberman
Lesley F. Portnoy
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
lfportnoy@pomlaw.com

28

**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**
Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

# Certification of Plaintiff
# Pursuant to Federal Securities Laws

1. I, Frank Erickson, make this declaration pursuant to Section 101 of the Private Securities Litigation Reform Act of 1995 as required by Section 21D (a) (2) of Title I of the Securities Exchange Act of 1934.

2. I have reviewed a Complaint against Corinthian Colleges Inc. ("Corinthian"), and authorize a filing of a comparable complaint on my behalf.

3. I did not purchase my Corinthian securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under Title I of the Securities Exchange Act of 1934.

4. I am willing to serve as a representative party on behalf of a class as set forth in the Complaint, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my purchases and sales in Corinthian securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws, except as follows:

7. I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

8. The matters stated in this declaration are true to the best of my current knowledge, information and belief.

I declare under penalty or perjury that the foregoing is true and correct.

Executed ___6 | 12 | 2013___
         **(Date)**

_____
**(Signature)**

Frank   Erickson
**(Type or Print Name)**

## Summary of Purchases and Sales

| DATE | TRANSACTION TYPE: PURCHASE OR SALE | NUMBER/ TYPE OF SECURITY | PRICE OF SECURITY |
|------|-----------------------------------|--------------------------|-------------------|
| | | | |
| 5-16-2013 | Purchase | 400 | 2.48 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |