Murielle Steven Walsh (*to be admitted pro hac*)
Jeremy A. Lieberman (*to be admitted pro hac vice*)
Star Mishkel Tyner (State Bar #254974)
Lesley F. Portnoy (*to be admitted pro hac vice*)
POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

*Lead Counsel for Lead Plaintiff*

FILED
CLERK, U.S. DISTRICT COURT

DEC - 3 2013

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| FRANK ERICKSON, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CORINTHIAN COLLEGES, INC., JACK P. MASSIMINO, ROBERT C. OWEN and KENNETH S. ORD, <br><br> Defendants. | Civil No. 2:13-cv-07466-GHK-PJW <br><br> FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |

1   Lead Plaintiff Frank Erickson ("Lead Plaintiff"), individually and on behalf of all
2   other persons similarly situated, by his undersigned attorneys, for his first amended
3   complaint against defendants Corinthian Colleges, Inc. ("Corinthian" or the
4   "Company"), Jack P. Massimino, Robert C. Owen, and Kenneth S. Ord (collectively,
5   "Defendants"), alleges the following based upon personal knowledge as to himself and
6   his own acts, and information and belief as to all other matters, based upon, *inter alia*,
7   the investigation conducted by and through his attorneys, which included, among other
8   things, a review of the Defendants' public documents, conference calls and
9   announcements made by Defendants, United States Securities and Exchange
10   Commission ("SEC") filings, wire and press releases published by and regarding
11   Corinthian, analysts' reports and advisories about the Company, interviews with
12   witnesses, and information readily obtainable on the Internet. Lead Plaintiff believes that
13   substantial evidentiary support will exist for the allegations set forth herein after a
14   reasonable opportunity for discovery.

## NATURE OF THE ACTION

16   1.   This is a federal securities class action on behalf of a class consisting of all
17   persons other than Defendants who purchased or otherwise acquired Corinthian
18   securities between February 1, 2011 and October 11, 2013, both dates inclusive (the
19   "Class Period"), seeking to recover damages caused by Defendants' violations of the
20   federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities
21   Exchange Act of 1934 (the "Exchange Act") and Rules 10b-5 promulgated thereunder
22   against the Company and certain of its top officials and/or directors.

23   2.   Corinthian is a publicly traded, for-profit education company headquartered
24   in Santa Ana, CA. Corinthian operates a total of 111 campuses in 25 States, along with
25   an online division, and offers diploma and degree programs in health care, business,
26   criminal justice, transportation technology and maintenance, construction trades, and
27   information technology. Approximately 34% of Corinthian students are enrolled online,

28   FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW

and 64% are enrolled in diploma (non-degree) programs.

3.      The Company derives over 80% of its revenues from federal education funds, such as the Pell grant and Stafford loan programs, which assist students in paying for higher education programs. Between 2007 and 2010, the Company tripled the amount of Pell grants it collects, from $170.2 million in 2007 to $509.3 million in 2010.

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants manipulated federal student loan and grant programs in order to appear to be in compliance with new federal regulations enacted in June 2011; (ii) Defendants misrepresented the Company's job placement rates; and (iii) Defendants' predatory and deceptive recruiting and enrollment practices violated federal regulations.

5.      As detailed further herein, the truth slowly emerged to the market in a series of partial corrective disclosures.

6.      On July 30, 2012, a Congressional committee headed by Senator Thomas Harkin ("Harkin Report") published a scathing report of the profit-educational sector, and in particular, regarding Corinthian's predatory and aggressive tactics with respect to student enrollment. In response to the disclosure of the Harkin Report, the price of Corinthian securities toppled $0.13, or 6.4%, to close at $1.89 on July 30, 2012.

7.      On June 10, 2013, the Company disclosed that the SEC was conducting an investigation into the company and had requested documents and communications related to student recruitment, attendance, completion, placement, defaults on loans, along with information on other corporate and financial matters.

8.      On this news, Corinthian securities declined $0.33 per share or nearly 12%, to close at $2.46 per share on June 11, 2013.

9.      On October 11, 2013, the Company revealed that the California Attorney General filed a complaint against Corinthian and its various subsidiaries in California state court for, inter alia, untrue and misleading representations, unfair competition and

securities fraud violations. The Complaint revealed new and previously undisclosed facts regarding Defendants' misrepresentation and omissions with respect to job placement rates.

10.    In response to the news of the California Attorney General's lawsuit, the price of Corinthian securities fell 4.16%.

11.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n(a) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5, 17 C.F.R. § 240.14a-9).

13.    This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

14.    Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as Corinthian's securities are traded within this District.

15.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.    Lead Plaintiff, as set forth in the previously filed Certification, acquired Corinthian securities at artificially inflated prices during the Class Period and was damaged upon the announcement of the alleged corrective disclosures.

17.    Defendant Corinthian is a Delaware corporation with its principal executive offices located at 6 Hutton Centre Drive, Santa Ana, CA 92707. Corinthian's common stock trades on the NASDAQ under the ticker symbol "COCO."

18.     Defendant Jack Massimino ("Massimino") is the Company's Chairman and Chief Executive Officer ("CEO").

19.     Defendant Robert C. Owen ("Owen") served as the Company's Executive Vice-President and Chief Accounting Officer from July 2011 through September 2011, and as Executive Vice-President and Chief Financial Officer from September 2011 to the present.

20.     Defendant Kenneth S. Ord ("Ord") has served as the Company's Executive Vice-President, Chief Administrative Officer and Chief Financial Officer during the Class Period.

21.     The defendants referenced above in ¶¶ 17-20 are sometimes referred to herein as the "Individual Defendants."

22.     During the Class Period, the Individual Defendants ran Corinthian as "hands-on" managers, oversaw Corinthian's operations and finances, and made the material false and misleading statements described herein. The Individual Defendants were intimately knowledgeable about all aspects of Corinthian's financial and business operations, as they received daily reports and had access to computerized information regarding job placement rates and regulatory compliance data. They also were involved in deciding which disclosures would be made by the Company. Indeed, the Individual Defendants made various public statements for Corinthian during the Class Period and participated in all Class Period investor conferences. The Individual Defendants also signed Corinthian's filings with the SEC during the Class Period, including certificates filed pursuant to the Sarbanes-Oxley Act of 2002 stating the financial reports were accurate and complied with GAAP.

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

23.     Corinthian is a publicly traded, for-profit education company headquartered in Santa Ana, California. Corinthian is one of the largest for-profit post-secondary education companies in the United States and Canada, allegedly serving the segment of

the population seeking to acquire career-oriented education. As of June 30, 2013, Corinthian had a student enrollment of 81,284 and operates a total of 111 campuses in 25 states and the province of Ontario, Canada, along with an online division. It offers a variety of diploma and degree programs in health care, business, criminal justice, transportation technology and maintenance, construction trades, and information technology. Approximately 34% of Corinthian students are enrolled online, and 64% are enrolled in diploma (non-degree) programs.

24.     The Company operates through three distinct schools chains: (1) Everest College, which focuses on diploma-level allied health programs and online associates degrees, (2) Wyotech, which focuses on automotive and skilled trade programs, and (3) Heald College, which offers associates and bachelor degrees in business and information technology. Everest is the dominant division, contributing approximately 70 – 80% of Corinthian's annual revenue.

25.     Historically, Corinthian has grown its business by opening new branch campuses, remodeling, expanding or relocating existing campuses and expanding the number of programs at existing campuses. Since the Company's formation in 1995, it has acquired 76 colleges and opened 35 new branch campuses.

26.     On August 3, 2010 the United States Government Accountability Office ("GAO") issued a report concluding that for-profit educational colleges such as Corinthian had engaged in an illegal and fraudulent course of action designed to recruit students and overcharge the federal government for the cost of such education. Thereafter, a Congressional Committee, led by Senator Tom Harkin, launched an investigation of such practices.

27.     Over the course of the following two years, and in response to the GAO report and Congressional investigation, several state authorities began investigating the Company, including the Attorney General's Office for the states of Massachusetts, Georgia, New York, Oregon, Illinois and California, as well as the United States Consumer Financial Protection Bureau.

28. In response to reports of similar misconduct by other for-profit education companies, in June 2011, President Obama released final regulations requiring for profit colleges such as Corinthian to better prepare students for gainful employment or risk losing access to Federal student aid.

## DEFENDANTS' SCHEME TO FALSIFY STUDENT AND FINANCIAL AID STATISTICS AND INFLATE SHARE PRICES

### *CORINTHIAN'S INFLATION OF JOB PLACEMENT RATES*

29. Corinthian markets itself as a career-focused school and entices student to enroll by offering the prospect of better jobs and higher wages. To market its programs, Corinthian uses job placement data to lure students as well as to satisfy regulators and accrediting agencies that the schools are performing adequately and to maintain access to Title IV funding.

30. Under the HEA, institutions like Corinthian "must make available to any enrolled student or prospective student through appropriate publications, mailings or electronic media, information concerning … [t]he placement of, and types of employment obtained by, graduates of the institution's degree or certificate programs…. The institution must identify the source of the information provided in compliance with this paragraph, as well as any time frames and methodology associated with it." 34 C.F.R. § 41. Furthermore, "[t]he institution must disclose any placement rates it calculates." *Id.*

31. In addition, state authorization and accreditation by an accrediting commission recognized by the DOE are required for a "for-profit" institution to become and remain eligible for Title IV funding. The Accrediting Commission of Career Schools and Colleges ("ACCSC") requires each accredited institution to maintain job placement standards of 65%. An institution with placement rates not meeting this benchmark may be subject to reporting and risk losing federal Title IV funding.

32. Unbeknownst to the market and investors, because of the stringent reporting requirements imposed on Corinthian by these rules and regulations, and in order to

1   maintain the all-important Title IV funding, Defendants consistently manipulated and

2   misrepresented the Company's job placement rates throughout the Class Period.

3   ### *False and Misleading Statements Regarding Job Placement*

4   33.   On February 1, 2011, the Company issued a press release announcing

5   financial results for the second quarter ended December 31, 2010, reporting net revenue

6   of $482.8 million, total student population of 105,498, total new students of 26,831,

7   operating loss of $173.2 million and diluted loss per share of $1.94. The press release

8   also stated:

> "During the second quarter we completed an executive leadership transition
> and sharpened our focus on student outcomes, employee development, and
> financial performance" said Jack Massimino, Corinthian chairman and chief
> executive officer. ***In the area of outcomes, we continue to review our
> programs to ensure that students are well-served in terms of completion,
> placement and value proposition.***" (Emphasis added.)

34.   On March 14, 2011, the Company used a presentation at the Credit Suisse
13th Annual Global Services Conference, representing that it was "[r]eviewing programs
to ensure students are well-served in terms of completion, placement, overall value" and
that "[s]tudent outcomes take precedence over growth."

35.   On May 3, 2011, the Company issued a press release announcing financial
results for the third quarter ended March 31, 2011, reporting net revenue of $462.3
million, total student population of 102,450, total new students of 29,390, operating
income of $26.7 million and diluted earnings per share of $0.19. The press release also
stated:

> "During the third quarter we made progress in several areas, including
> student outcomes, compliance, and operational and financial management,"
> said Jack Massimino, Corinthian chairman and chief executive officer. ***In
> the area of outcomes, we continue to review our programs to ensure that
> students are well-served in terms of completion, placement and overall
> value. In calendar 2010, a record 60,000 students graduated from our
> programs, and in spite of a weak economy, we expect approximately
> 42,000 of these graduates to obtain employment in their fields of study.***"

(Emphasis added.)

36.   On August 23, 2011, the Company issued a press release announcing fiscal year 2011 fourth quarter and annual financial results, reporting fourth quarter net revenue of $425.2 million, total student population of 93,457, total new students of 24,981, operating income of $6.7 million and a net income of $3.4 million. The press release also stated:

> "We navigated through a number of challenges in fiscal 2011 and made progress in several areas," said Jack Massimino, Corinthian chairman and chief executive officer. ***"We continued to focus on student completion, and we assisted a record number of graduates in finding jobs in their fields of study.*** In the area of regulatory compliance, we developed and implemented a new compensation program for front-line admissions and student finance representatives and expanded our disclosures related to completion, placement and program costs.... We also continued to increase the efficiency of our back-end operations, particularly in the area of cohort default management and financial aid processing. As a result, we no longer consider two-year CDRs to be a significant risk for our company." (Emphasis added.)

37.   On August 24, 2011 the Company filed an annual report for the period ended June 30, 2011 on a Form 10-K with the SEC, where it reiterated the financial results set forth in ¶ 36. The Form 10-K was signed by Defendants Massimino, Ord and Owen, and was also certified by them as to accuracy pursuant to the Sarbanes-Oxley Act of 2002. The 10-K stated:

> ***Placement***
> Graduate placement outcomes are critical to the success of our schools and their ability to continue to enroll new students. We maintain a career services department at each college and, as of June 30, 2011, employed approximately 850 individuals in this capacity. We require our career services personnel to work with students from the time they begin their courses of study until they are successfully placed in jobs for which they are trained. Our career services departments assist students with resumes, help them develop a professional demeanor, conduct practice interview sessions, and identify prospective employers for the graduates. Overall, we believe the efforts we devote to help our graduates find employment have achieved

solid results in a difficult economic environment.

Our colleges endeavor to obtain information regarding their students' employment following graduation. The reliability of that information depends, to a large extent, on the completeness and accuracy of the data provided to our colleges by graduates and their employers. Additionally, a dedicated team at the campus support center conducts a verification process to check the accuracy of the placement information gathered by our campuses. *Based on information received from these groups of people, we believe that approximately 67.6% of our graduates in calendar year 2010 who were available for placement have been placed in a job for which they were trained by June 30, 2011, using accrediting agency standards.* The various accrediting agencies evaluate placement rates by individual institution and program, and have different requirements regarding which students are considered "available for placement." In defining the graduate cohort group for the purpose of calculating placement rates, certain accrediting agencies may exclude, for example, graduates who are continuing their education, are in active military service or are deceased or disabled, and foreign students who are ineligible to work in the U.S. after graduation. Where applicable, we have also excluded those graduates in our calculation of students available for placement and the graduate placement rate. (Emphasis added.)

38.    The August 24, 2011 Form 10-K also disclosed:

Since October 2010, the Company has been contacted by Attorneys General offices in the states of Florida, California, Massachusetts, New York and Oregon. Each of those states' attorneys general office has requested from the Company, either through subpoenas, civil investigative demands, or informal requests, an extensive range of documents regarding its business. In every state but California, we understand the attorneys general are conducting broad inquiries into private sector education companies in their respective states, and not solely into the Company. *In California, the California Attorney General's Office has requested information ostensibly pursuant to the Stipulated Judgment agreed to by the Company in July 2007 to determine compliance by the Company with the judgment and certain other matters.* The Company is cooperating with these requests. (Emphasis added.)

39.    On September 11, 2011, the Company used a presentation at the BMO Capital Markets 11th Annual Back to School Education Conference, representing that it had "Continued focus on career placement: 67.5% (over 40,000 graduates) in CY10."

40.     On May 3, 2012, the Company issued a press release announcing financial results for the third quarter ended March 31, 2012, reporting net revenue of $424.1 million, total student population of 96,631, total new students of 29,427, operating income of $26.1 million and net income of $0.11 per share. In the press release, Defendants also represented:

> "In the third quarter we continued to focus on student outcomes, fiscal discipline, and operational efficiency," said Jack Massimino, Corinthian's Chairman and Chief Executive Officer. "*Our student attrition and graduate employment trends continue to make incremental improvement compared with the prior year, primarily the result of reducing the risk profile of our students, closing underperforming programs and schools, and our ongoing efforts to help students succeed.*" (Emphasis added.)

41.     On August 20, 2012, the Company issued a press release announcing fiscal year 2012 fourth quarter and annual financial results, reporting fourth quarter net revenue of $394.8 million, total student population of 91,460, total new students of 25,839, operating income of $16.4 million and a net loss of $6.5 million. The Company also reported annual revenues of $1.6 billion and a net loss of $10.2 million or $0.12 per share. The press release stated:

> "Fiscal 2012 was a year of progress against a backdrop of adapting to regulatory change," said Jack Massimino, Corinthian chairman and chief executive officer. "*We continued to focus on student completion and achieved a slight increase in our graduate placement rate despite a weak economy.* We reduced operating expenses to align with our lower student population and took steps to close or sell nine underperforming campuses. We strengthened our financial position by renewing our line of credit on favorable terms, completing a sale-leaseback of five Heald facilities, and extending by two years our student lending agreement with ASFG. We continued to increase the efficiency of our back-end operations by completing the implementation of our common student information system at Heald. We brought student financial aid processing in-house and substantially reduced bad debt as a percent of revenue. *We also made progress in cohort default prevention and as a result, no longer consider two-year or three-year cohort default rates to pose an immediate risk to*

*our company. On the regulatory front, we continued to implement policies and procedures in response to new federal regulations and remained focused on compliance.*" (Emphasis added.)

42.  On August 20, 2012, the Company held a conference call with investors to discuss the quarterly and annual results for the recently ended period. During that call Defendant Massimino stated:

> "We made considerable operational progress in fiscal 2012 while continuing our transition to new federal regulations.... In light of this challenging economic environment, we're very pleased to report that more than two-thirds of our nearly 49,000 graduates in calendar year 2011 found jobs in the fields for which they were trained. We implemented policies and procedures in response to new regulatory requirements in a number of areas, primarily marketing, admissions, and student finance. We continued to focus on improving the student value proposition while complying with the 90/10 Rule. *For students who graduated in calendar 2011, 68.1% or more than 33,000 graduates found employment in their fields of study. This is up slightly from 67.6% in the previous year, and the current run rate for calendar 2012 grads is higher than in 2011. We're making the transition to new federal regulations and remain focused on compliance.* We have a number of initiatives in place to help address the loss of ability-to-benefit students and generate positive new enrollment growth beginning in the back half of fiscal 2013." (Emphasis added.)

43.  Furthermore, in the presentation used to communicate the fourth quarter financial results to investors, the Company represented that it had "[c]ontinued focus on graduate placement: CY 11 placement 68.1% vs. 67.6% in CY 10."

44.  On August 24, 2012 the Company filed an annual report for the period ended June 30, 2012 on a Form 10-K with the SEC, where it reiterated the financial results set forth in ¶ 41. The Form 10-K was signed by Defendants Massimino and Owen, and was also certified by them as to accuracy pursuant to the Sarbanes-Oxley Act of 2002. The 10-K stated:

> We believe that helping our students achieve positive outcomes is not only best for the student, but critical to our long-term success. Accordingly, we devote substantial resources to maintaining and improving student

FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW                                                              11

completion and placement rates. High completion and placement rates enhance a school's reputation and the marketability of its programs, and even modest improvements in student completion can have a significant positive impact on our profitability. We have implemented a variety of student service programs, including orientation and tutoring, academic advising, ride-sharing and referral programs, all of which are designed to help students complete their programs, graduate and achieve their career goals. We use a curriculum development team comprised of campus representatives, corporate program directors, instructional design professionals, and textbook publishers. For each program area, each campus also uses advisory boards comprised of local business professionals to help ensure that its curricula meet employer requirements. We also maintain full-time career services personnel at our schools who are responsible for helping our students obtain employment. Career services identifies prospective employers, helps students prepare resumes, conducts practice interviews, establishes externship programs and tracks graduate placement success.

***Placement***

Graduate placement outcomes are critical to the success of our schools and their ability to continue to enroll new students. We maintain a career services department at each school and as of June 30, 2012, employed approximately 850 individuals in this capacity. We require our career services personnel to work with students from the time they begin their courses of study until they are successfully placed in jobs for which they are trained. Our career services departments assist students in preparing resumes, help them to develop a professional demeanor, conduct practice interview sessions, and identify prospective employers for graduates. Overall, we believe the efforts we devote to help our graduates find employment have achieved solid results in a difficult economic environment.

Our colleges endeavor to obtain information regarding their students' employment following graduation. The reliability of that information depends, to a large extent, on the completeness and accuracy of the data provided to our colleges by graduates and their employers. Additionally, a dedicated team at the campus support center conducts a verification process to check the accuracy of the placement information gathered by our campuses. ***Based on information received from these groups of people, we believe that approximately 68.1% of our graduates in calendar year 2011 who were available for placement have been placed in a job for which***

---

FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW                                                                    12

*they were trained by June 30, 2012, using accrediting agency standards.* (Emphasis added.)

45.     On September 30, 2012, Defendant Massimino stated, "The investment thesis for us is pretty straightforward, as I said earlier, career-oriented, that's a big deal to us. I mean, we're teaching students how to become prepared for their first job. Not only do we teach them and get them through the process, we also spend a lot of time getting them placed, getting them jobs after the fact...."

46.     In an October 31, 2012 conference call communicating first quarter 2013 earnings results, Defendant Massimino stated, "I'll begin with student outcome, as we discuss[ed] on our last call, we helped 33,000 of our calendar 2011 graduates find employment in their chosen filed. *That equates for the graduates placement rate of 68.1%, which were slightly ahead of the previous calendar year.* Although, we continue to work on placing the remaining graduates in the 2011 cohort; we're now focused primarily on helping our calendar 2012 graduates find work. Our placement run rate for calendar 2012 graduates was up slightly at the end of the first quarter, compared with the same period last year." (Emphasis added.)

47.     In an October 31, 2012 presentation reporting first quarter 2012 financial results to investors, the Company represented that it had "[i]mproving graduate placement: CY 11 placement 68.1% vs. 67.6% in CY 10."

48.     On January 31, 2013, the Company issued a press release announcing financial results for the second quarter ended December 31, 2012, reporting net revenue of $409.7 million, total student population of 88,688, total new students of 23,703, and operating income of $14.1 million. The press release quoted Defendant Massimino, stating, "During the second quarter we continued to focus on student completion and graduate placement, as well as several initiatives to strengthen and diversify operations and restore growth...."

49.     Also on January 31, 2013, the Company held a conference call with investors to discuss the results from the recently ended period. Defendant Massimino stated during the conference call, "In the area of placement, we continue to achieve solid

results for the 2012 cohort graduates. We currently expect our calendar 2013 placement rate to meet or slightly exceed our placement rate in calendar 2011 which was 68.1%."

50.     On January 31, 2013, March 11, 2013 and April 30, 2013, Defendant Massimino made a presentation to investors that 33,316 of 48,930 eligible graduates in the 2011 graduation cohort were "placed in field."

51.     On March 31, 2013, in a presentation at the Credit Suisse 15th Annual Global Services Conference, Defendant Massimino stated:

> "This is just a quick slide on information we've given you over the years around graduation and placement. *And one of the things we're pretty proud of is in a pretty difficult time, we have done a pretty remarkable job in terms of placement.* We have over 800 placement people in our organization today helping our students get jobs in the areas we trained them for. *We're very tight on out definitions.* And so if you're a medical assistant, for example, with us and you get a job at a doctor's or the hospital, those count. If you get a job as an aide in a nursing home, that does not count even though you're making $10 to $12 an hour. *So we're very tight on our definitions around what is and what isn't included in our placements. We've been averaging over the course of this very difficult time up to around 68%, 69%, and we're about there again this year.*" (Emphasis added.)

52.     In an April 30, 2013 conference call relaying third quarter 2013 earnings results, Defendant Massimino stated:

> Our graduate placement rate, the most important metric in the company, remains steady in a challenging labor market…. In the area of placement, we're achieving consistent results for the 2012 cohort of graduates. We continue to expect our calendar 2012 placement rate to meet or slightly exceed our placement rate in calendar 2011, which was 68.1%.

53.     In an April 30, 2013 presentation reporting third quarter 2013 financial results to investors, the Company represented, "Over the past few years, we have made significant investments to improve operations and student outcomes."

54.     On August 20, 2013 and October 31, 2013, Defendant Massimino used a presentation with investors that stated "CY [Calendar Year] 11 placement 68.1% vs.

FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW                                                                 14

67.6% in CY 10."

55.    In an August 29, 2013 conference call relaying fourth quarter 2013 earnings results, Defendant Massimino stated:

> I want to spend a few minutes now discussing our fiscal 2013 progress, starting with student outcomes. ***For our schools and students, employment upon graduation is the most important measure of success. Approximately 69% of our 39,000 graduates in calendar 2012 or 27,000 individuals found employment in their fields of study as of June 30, 2013.*** This placement rate is for continuing operations and is up slightly from the previous year. We're striving to do even better, but in light of the weak economic recovery, we're proud of what we helped our graduates achieve. We have over 750 career service employees who assist our graduates in finding employment. (Emphasis added.)

56.    On September 12, 2013, the Company used a presentation at the BMO Capital Markets 13th Annual Back to School Education Conference, representing its "[c]onsistent review of completion, placement results: [p]lacement verification team in place; verifying ~94% of placements."

57.    On August 29, 2013, the Company issued a press release announcing fiscal year 2013 fourth quarter and annual financial results, reporting fourth quarter net revenue of $377.5 million, total student population of 81,284, total new students of 24,276, operating income of $7.9 million, a net loss of $2.2 million and diluted earnings per share of $0.08. The Company also reported annual revenues of $1.6 billion and a net loss of $1.7 million. Quoting Defendant Massimino, the press release stated:

> "***We continued to focus on student completion and achieved a slight increase in our graduate placement rate despite a weak labor market.*** We reduced operating expenses to align with our lower student population and closed or sold underperforming campuses. We continued to increase the efficiency of our operations through increased automation and standardization in a number of areas, including online service center technology, faculty hiring and on-boarding, career services and compliance. ***On the regulatory front, we maintained our strong culture of compliance and continued to cooperate with regulators on several inquiries.***" (Emphasis added.)

58.     On September 3, 2013 the Company filed an annual report for the period ended June 30, 2013 on a Form 10-K with the SEC, where it reiterated the financial results set forth in ¶ 57. The Form 10-K was signed by Defendants Massimino and Owen, and was also certified by them as to accuracy pursuant to the Sarbanes-Oxley Act of 2002. The 10-K stated:

> Our colleges endeavor to obtain information regarding their students' employment following graduation. The reliability of that information depends, to a large extent, on the completeness and accuracy of the data provided to our colleges by graduates and their employers. Our career services personnel at each campus attempt to obtain employment verification documentation from employers or graduates. ***Additionally, a team at the campus support center conducts a verification process to assist in confirming the accuracy of the placement information gathered by our campuses by attempting to contact employers by telephone, and, if the employers cannot be reached, by attempting to contact the graduates themselves.***
>
> ***Based on information received from employers and graduates, and the verification process described above, we believe that approximately 69% of our graduates in calendar year 2012 who were available for placement have been placed in a job for which they were trained by June 30, 2013.*** This percentage is calculated using the standards that our various accreditors require, subject to certain interpretive judgments discussed below and the adjustments necessary to report on a calendar year basis. For our Heald College and Everest College Phoenix campuses, whose regional accreditors do not require the colleges to maintain minimum placement standards, we reference the standards of one of our national accrediting agencies to calculate their respective placement rates for purposes of our own assessments. (Emphasis added.)

### *Why Defendants' Statements Were False and Misleading*

59.     The aforementioned statements were false and misleading because, according to Corinthian's own internal data as well as information gained from confidential witnesses, suggests the actual job placement rate was much lower and had been subject to manipulations and assumptions not disclosed to investors, including, *inter alia*:

a. Graduation and placement data from closed schools is excluded from these calculations;

b. The data used by Corinthian to generate the placement rate included a substantial amount of placements that occurred outside the time frame specified by the disclosures;

c. The data used by Corinthian to generate the placement rate included a substantial number of double-counted placements;

d. A substantial number of placements included in the Company's job placement calculations were in fact not verified;

e. The Company failed to document a significant number of counted placements;

f. The Company included placements that were not within graduates' fields of study;

g. The Company manipulated job descriptions so that jobs would be included falsely with a graduate's field of study;

h. The Company paid temporary agencies and other employers to employ its graduates;

i. The Company had serious placement verification issues, including a lack of definitions or standard procedures for graduate placement; and

j. Campuses failed to provide adequate or accurate documentation of graduate placements.

60.     According to the lawsuit filed by the California Attorney General ("AG"), which relies on internal company emails and other corporate documents for its allegations, Corinthian senior executives had firsthand knowledge regarding misconduct with respect to job placement rates:

- On or about September 23, 2011, [Corinthian's] CEO, Jack Massimino, e-mailed a presentation that was to be read by the ELT [Executive Leadership Team] in advance of an offsite meeting. One of the slides stated: "We have a

FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW                                                              17

placement compliance problem now."

- On or about December 7, 2011, the Accrediting Commission of Career Schools and Colleges (ACCSC) sent a letter to the Campus President of Everest College Hayward noting that "39 of the 167 [medical assistant] students reported as employed in field were employed by the same agency, Select Staffing" and that the documentation provided by Everest "did not clearly demonstrate that the employment at Select Staffing constitutes sustainable employment in a related field." In response, Everest College Hayward admitted that the positions were health screening fair positions but stated that the positions were valid placements. On or about June 6, 2012, ACCSC sent a follow-up letter to the Campus President, noting that "the majority of placements with Select Staffing resulted in two days of employment and did not clearly demonstrate that the employment at Select Staffing constitutes 'sustainable' employment for a reasonable period of time in a field related to the graduate's educational program."

- On or about February 10, 2012, [Corinthian's] Western Division President, Nicole Carnagey, e-mailed the Executive Vice President of Operations, Bob Bosic, to tell him that in 2011 Everest College Hayward and Everest College San Francisco paid a temporary agency, Remedy Temp, "to place students to meet accreditation deadline and minimum placement %." Bosic responded, asking her to find the answers to numerous questions regarding the placements and noted "This is the [expletive omitted] that got [Everest College] Decatur in trouble and the types of questions that need answering."

- On or about March 20, 2012, [a]n Everest College San Francisco internal audit showing that 53 percent of student placement files reviewed were missing employment verification forms was emailed to the CEO, Jack Massimino, and other senior executives.

- On or about April 13, 2012, an Everest Online internal audit presentation emailed to David Poldoian, Executive Vice President of Corinthian Colleges, Inc.'s Online Learning Division, showed a placement file error rate of 53.6 percent to 70.6 percent.

- On or about April 27, 2012, [Corinthian's] Executive Vice President of

FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW

18

Operations, Bob Bosic e-mailed all division presidents and stated "the placement verification issues we discussed Monday were hares over the last two days and were not well received. We will discuss Monday, but together we'll need to demonstrate improvement. I will be interested in your thoughts on how we can tighten this up so future audits reflect greater accuracy and completion of documents."

• On or about May 12, 2012, [Corinthian's] Executive Vice President of Operations, Bob Bosic, e-mailed the Chief Administrative Officer Ken Ord and Carmella Cassetta, Senior Vice President and President, Online Learning a copy of a presentation regarding placements which stated "No current guidelines and training to define a placement – mistakes are repeated constantly because no clear definition of a placement exists;" and "inconsistent processes on what passes as in-field or related [placement]."

• On or about May 18, 2012, [Corinthian's] Western Division President, Nicole Carnagey and Executive Vice President of Operations, Bob Bosic exchanged e-mails regarding Renton, Washington Everest campus's failure of an internal audit due to backdating of signatures on placement files. The e-mails discussed how Everest College Gardena (in California) "almost got hit" as well as saying that "If the current RVPO [Regional Vice President of Operations] was there she would have been in a world of [expletive omitted]." The Executive Vice President, Bob Bosic also told the Western Division President, Nicole Carnagey that "you are correct that all the other campuses in yours and other divisions that made it through [verification audits] this time are lucky."

• On or about June 14, 2012, [Corinthian's] Executive Vice President of Operations, Bob Bosic, e-mailed the CEO, Jack Massimino, regarding the findings of an internal audit review of placement procedures and stated that the review found that there was a "Lack of workable definitions for a Placement" and that the lack of specific definitions resulted "in subjective decisions at all levels;" that there "is no consistent process for Placement (or other areas of Career Services) and lack of SOP's [Standard Operating Procedures];" that there "is generally no training at the process level for Placement (since there is not standard process);" and that "Campus Vue [Corinthian's] [data management system] is not fully utilized [which] [l]eads to poor data or lack of

data availability as well as duplication of data across forms and the Placement Verification system."

- On or about July 13, 2012, [Corinthian's] Vice President of Compliance, Michelle Reed e-mailed Beth Wilson, Executive Vice President, regarding results of a review of Wyotech Long Beach self-employment placements. The review showed that the files for 28 of 74 such placements had missing documents, or included Craigslist ads that purported to be from the students in question, but that had in fact been created by [Corinthian]. An additional 15 files were suspicious. Despite these known irregularities, as of 8/12/2013, the Long Beach disclosure (published on 7/1/2012) had not been amended to take into account the audit's findings.

- On or about July 16, 2012, [Corinthian's] Assistant Vice President of Student Outcomes e-mailed Division Presidents regarding Career Services Operating Procedures, with a copy to the Executive Vice President of Operations. The emails stated that, "[o]ver the past year, several campuses have had challenges providing adequate documentation for placements and waivers. Issues that have surfaced during audits and Employment Verification reviews are missing key fields such as signatures, inconsistencies with CampusVue / other backup and in some cases, documentation that was never procedure or cannot be found." (Emphasis omitted).

- On or about August 28, 2012, the results of a third-party audit conducted by Hyper Core solutions on behalf of an accreditor, ACCSC, were e-mailed to [Corinthian's] Executive Vice President and Chief Academic Officer. The review, which examined a random sample of 330 student records showed substantial issues at each [Corinthian] campus examined (Everest campuses including West Los Angeles, City of Industry and Reseda). In particular, the review found that 30 percent of the placements could not be verified and that there were no records to substantiate a further 9 percent of the placements. At Everest College West Los Angeles, only 30 percent of criminal justice program placements could be verified and 20 percent were identified as no record found. At the same campus, only 36 percent of dental assistant program placements could be verified and 55 percent were identified as no record found.

61.   Furthermore, the California AG cited new evidence suggesting that Corinthian's own data and files show that the actual job placement rate is much lower than represented and has been subjected to manipulation and assumptions not disclosed to investors, including:

- On or about July 31, 2012, Beth Wilson Executive Vice President of [Corinthian] instructed her team to exclude 2011 graduates from what she deemed "Closed Schools" including Fife, Washington, Chicago, Illinois, Ft. Lauderdale, Florida, Decatur, Georgia and Arlington, Texas from the calculation to bring the placement rate higher. This adjustment was not disclosed to investors.

- The data used by [Corinthian] to generate the placement rate included a substantial number of placements that occurred outside the time frame specified by the disclosures.

- The data used by [Corinthian] to generate the placement rate included a substantial number of double-counted placements.

- On or about November 16, 2012 (nearly three months after the disclosure of the 68.1 percent placement rate in the annual report), Michelle Reed, Vice President of Compliance, emailed a spreadsheet showing that a substantial number of placements and waivers for the 2011 graduation cohort had still not been verified.

62.   The manipulation and falsification of Corinthian's job placement rates are further corroborated by confidential witnesses.

63.   **Confidential Witness 1.** CW1[1] worked as a career services representative at one of Corinthian's Everest College campuses in California from July 2012 to January 2013. According to CW1, many of the graduates she attempted to place in permanent jobs had not learned enough skills from their program of study to obtain a job in their

---

[1] Certain allegations are based on information obtained from former employees, who are identified herein as "Confidential Witness __" or "CW__."

chosen field. CW1 also said that Everest graduates expected higher paying jobs because of the promises made to them when signing up for the school's programs and were furious when they did not obtain higher paying jobs upon graduation. "They give a lot of false impressions to students in terms of possible positions they can obtain after graduation," CW1 said. Furthermore, CW1 stated that the campus placement rate was often below 40%, well below the 65% threshold required under HEA and the 68.1% placement rate that Corinthian represented to investors. CW1 said that even part-time jobs qualified as a placement, even if those part-time jobs were only a few hours a week or one day a week. CW1 recalls the Director of Career Services instructing career service representatives to reword job descriptions so that it indicated the job involved more work in the student's field of study and would therefore qualify as a placement.

64. **Confidential Witness 2.** CW2 was an Admissions Representative and then a Career Services Counselor at an Everest University campus in Georgia during the Class Period, from July 2010 to April 2013. CW2 said her school failed to meet the minimum placement rate for accreditation in 2010 and 2011, and that the job placement rate was usually in the 40% to 50% range, well below the 65% threshold required under the HEA and the 68.1% and 67.6% placement rates for 2012 and 2011, respectively, that Corinthian represented to investors. In mid-2012, CW2 recalls being told that even if a student stayed in a job only for two weeks, it still counted as a placement for purposes of Corinthian's reported job placement numbers. Furthermore, CW2 stated that, even though the school promised job placement as a lifetime benefit to students, in reality, if a student was placed, they would get little, if any, help from career services staff if the student was fired, laid off or if the job did not work out otherwise.

65. **Confidential Witness 3.** CW3 was the Director of Career Services at an Everest University campus in Georgia from January 2012 to July 2012. Every night, CW3 was required to email updated job placement numbers to Robert Bosic, the Executive Vice President of Operations for Corinthian. CW3 was personally involved in a conference call every week with regional and upper management regarding each

FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW                                                           22

campus's job placement rates. CW3 said failing to meet minimum job placement rates was a common problem at Corinthian campuses across the country, and that at least 40 Corinthian schools failed to meet minimum job placement rates during his employment. CW3 said the idea was common knowledge that Corinthian's schools paid employers to hire students to boost job placement rates and heard other directors discussing the topic as a technique allegedly used to land job placements. CW3 recalls a specific instance in which the school resorted to paying an employer to hire its graduates – CW3 saw a contract between Corinthian and a doctor whereby the school agreed to pay the doctor for hiring its graduates. CW3 also said that Corinthian's policy, which was provided to him at training at the Santa Ana headquarters, stated that a graduate need only work one shift for a job to qualify as a placement. If the student was fired, quit or laid off after one shift, the job still counted as a placement.

66.     **Confidential Witness 4.** CW4 was President of an Everest University campus in Ohio from January 2012 to March 2013. He reported directly to the Regional Vice President of Operations. CW4 said the job placement rates at his campus were abysmal, in some programs between 30 and 40%. CW4 said the company held Quarterly Compliance Day calls, which were led by Bob Bosic, Executive Vice President of Operations. Mr. Bosic answered directly to Defendant Massimino. Prior to these Quarterly Compliance Day calls, the Company issued a quarterly compliance report showing which schools were not meeting retention rates, job placement rates and other benchmarks required by the Department of Education and accrediting bodies. According to CW4, the majority of Corinthian's 120 or so schools were on the call for failure to meet benchmarks.

67.     Despite their knowledge regarding the falsity of their representations with respect to the Company's job placement data, Defendants continually touted Corinthian's job placement rates throughout the Class Period.

## *CORINTHIAN'S MISLEADING ENROLLMENT PRACTICES*

68.     Enrollment growth is critical to the business success of a for-profit college

like Corinthian. In order to meet revenue expectations, Corinthian must recruit and enroll as many students as possible.

69.     Furthermore, in order to maintain its Title IV funding, Corinthian was required to maintain applicable accreditation standards with respect to its recruiting practices. Under ACCSC standards, these requirements included:

- "[R]ecruiting shall be ethical and compatible with the educational objectives of the institution…. The following minimums apply: (a) An institution shall ensure that any person or entity engaged in admissions or recruitment activities on its behalf is communicating current and accurate information regarding courses and programs, services, tuition, terms, and operating policies."

- Schools are required "to describe themselves to prospective students fully and accurately and to follow practices that permit prospective students to make informed and considered enrollment decisions without undue pressure. The school's recruitment efforts must attract students who are qualified and likely to complete and benefit from the training provided by the school and not simply obtain enrollments…. Each school observes ethical practices and procedures in the recruitment of its students.

- "No misrepresentations should be made in student recruitment, including…; b. misrepresenting job placement and employment opportunities for graduates; c. misrepresenting program costs; d. misrepresenting abilities required to complete intended program."

70.     Throughout the Class Period, Defendants violated the applicable accreditation requirements thorough manipulative and misrepresented enrollment practices, including, *inter alia*, enrolling students that were ineligible for student loans to meet admissions goals, predatory enrollment of students unfit for college-level work, and misrepresenting the cost of attendance to students.

71.     Unbeknownst to the market and investors, in order to comply with applicable regulatory and accreditation guidelines, and maintain Corinthian's all-

important Title IV funding, Defendants consistently misrepresented the Company's enrollment practices throughout the Class Period.

### *False and Misleading Statements Regarding Enrollment Practices*

72.     In an August 23, 2011 press release, Defendant Massimino stated, "In the area of regulatory compliance, we developed and implemented a new compensation program for front-line admissions and student finance representatives and expanded our disclosures related to completion, placement and program costs."

73.     In the Company's August 24, 2011 Form 10-K, Defendants represented:

*Admissions*
As of June 30, 2011, we employed approximately 2,400 admissions representatives who work directly with prospective students to facilitate the admissions process. These representatives interview and advise students interested in specific careers and are a key component of our effort to generate interest in our educational services. *We conduct semi-annual student satisfaction surveys at our campuses in the United States in which students have consistently given high marks to our admissions personnel for helpfulness, courtesy and accuracy of information. Because our success is highly dependent on the efficiency and effectiveness of our admissions process, we invest considerable resources to train our admissions representatives in product knowledge, regulatory compliance, and customer service. We also employ various admissions supervisory and monitoring programs, and conduct student surveys which help us ensure compliance with both government regulations and our corporate policies.*
One of our objectives in the admissions process is to identify students who have the ability to succeed in our schools. The majority of prospective students must pass a standardized admissions test. Most of our colleges in the United States have historically accepted non-high school graduates who can demonstrate an ability to benefit ("ATB students") from the program by passing certain tests which are required by ED. As of June 30, 2011, ATB students accounted for approximately 4.3% of total enrollments in our U.S. schools, down from 15.1% at June 30, 2010. However, ATB students are a higher risk population who complete their programs at a lower rate and default on their student loans at a higher rate than high school graduates. Accordingly, given the shift to a 3-year default measurement period, and the structural changes in student lending over the past two years, we had stopped enrolling new ATB students into our U.S. Everest and WyoTech

institutions starting on September 1, 2010. Due to the success of our default prevention initiatives, we resumed enrolling ATB students on a more limited basis in June 2011. We plan to limit ATB students to a maximum of 10% of total enrollment. (Emphasis added.)

74.    In a February 1, 2012 press release, Defendants represented:

"In the second quarter we remained focused on student outcomes, balancing expenses with current and projected enrollment, and improving the efficiency of back-end operations," said Jack Massimino, Corinthian Chairman and Chief Executive Officer. ***Our student attrition and graduate employment trends continue to make incremental improvement, primarily the result of reducing the risk profile of our students and our ongoing efforts to help students succeed.***

"As anticipated, the rate of decline in new student enrollment growth improved significantly in the quarter," Massimino said. "The improvement is the result of several factors, including a less challenging comparable from the second quarter last year, gradual stabilization in ground school new enrollments and continued strong growth at Everest University Online. In the last half of fiscal 2012, we expect new enrollments to be slightly positive." (Emphasis added.)

75.    In the Company's August 24, 2012 Form 10-K, Defendants represented:

***Admissions***

As of June 30, 2012, we employed approximately 2,380 admissions representatives who work directly with prospective students to facilitate the admissions process. These representatives interview and advise students interested in specific careers and are a key component of our effort to generate interest in our educational services. We conduct semi-annual student satisfaction surveys at our campuses in the United States in which students have consistently given high marks to our admissions personnel for helpfulness, courtesy and accuracy of information. Because our success is highly dependent on the efficiency and effectiveness of our admissions process, we invest considerable resources to train our admissions representatives in product knowledge, regulatory compliance, and customer service. We also employ various admissions supervisory and monitoring programs, and conduct student surveys which help us ensure compliance with both government regulations and our corporate policies.

76.    In an October 31, 2012 press release, Defendants stated:

"During the first quarter we continued to focus on improving the value proposition of our programs and rejuvenating growth in our ground schools," said Jack Massimino, Corinthian's chairman and chief executive officer. "We reduced tuition for several programs during the quarter, and our third-party lender reduced interest rates on gap financing for our students. We expect these reductions to help make our programs more affordable and attractive to prospective students."...

"Despite the loss of ATB students, our first quarter growth in new students was higher than expected," Massimino said. "During the quarter we continued to experience strong growth in on-line new student enrollment and new enrollments at our Everest ground schools were better than expected.

77. In an October 31, 2012 conference call, Defendant Massimino stated with respect to testing of potential students, "We're testing students, don't forget on the front end to determine eligibility. They have to come in at the certain level to be eligible for the program."

### *Why Defendants' Statements Were False and Misleading*

78. Defendants' statements concerning Corinthian's enrollment practices and reported enrollment numbers were misleading because Corinthian failed to comply with legal requirements governing access to federal education funds, including requirements with respect to admissions, attendance, academic progress and prohibitions on recruiting misrepresentations. Defendants' statements were false in light of misleading recruiting claims, manipulated admissions practices, widespread alteration of failing grades, and the retention of non-attending and failing students.

79. As detailed in the Harkin Report, Corinthian had low retention rates for its students. Accordingly, in order to maintain its enrollment numbers, the Company resorted to high pressure and manipulative tactics in order to boost its student enrollment and show the appearance of growth. The Report explained:

Moreover, the retention data also includes only first-time students who have never attended any other college. For example, the Corinthian Colleges, Inc.-owned schools reported an overall *retention* rate of 64 percent to the

Department of Education in the 2008–9 reporting period. This number was based on a first-time full-time population of 15,488 students. Yet, documents produced to the committee show that 130,920 students enrolled in Corinthian schools between 2008 and 2009. The retention rate measure failed to capture the vast majority of those students.

***

Because so many students leave school after a short period of time, for-profit colleges must enroll an enormous number of new students each year to meet Wall Street investor expectations of enrollment growth. This practice is known in the industry as "churn." For example, Corinthian Colleges, Inc., began 2010 with 86,066 students and ended with 110,550, a growth of 24,484 students. But, in the same period, 113,317 students left the company (some by graduating or completing programs), requiring Corinthian to enroll 137,831 new students to achieve that growth. In other words, to achieve net enrollment growth, Corinthian has to enroll the equivalent of its entire student body each year. The same trend is visible in the enrollment-withdrawal cycle at other colleges.

80.     Defendants' aforementioned representations with respect to Corinthian's enrollment practices were misleading because they concealed the fact that enrollment rates and growth were dependent on enrolling unqualified, failing and non-attending students as active students and churning thousands of applicants who dropped out quickly. Thus, Corinthian's reported enrollment numbers were inflated artificially by recruitment of students unfit for college-level work or were kept enrolled through manipulative grading and attendance practices. Admissions representatives were motivated, and indeed pressured, to recruit and enroll students who should not have been admitted. Similarly, instructors were motivated and pressured not to fails student who were not earning passing grades or attending classes.

81.     Testimony from confidential witnesses confirms the Company's misleading and predatory enrollment practices.

82.     **Confidential Witness 5.** CW5 was Re-Entry Coordinator for Everest University Online from October 2012 to February 2013. CW5's department was set up to pursue former students who had dropped out or failed out of Everest University Online to reenter the school. According to CW5, if a student had a 0.1 grade point

average, her department would attempt to convince the student to reenroll in the school and apply for a fresh round of financial aid to pay for tuition. CW5 received almost no training from Corinthian, and she was given free rein to convince students to attend.

83.    **Confidential Witness 6.** CW6 was the Director of High School Admissions for an Everest University campus in California from 2011 to April 2013. CW6 reported to the campus president, Mike Nielsen. CW6's job focused on recruiting high school students by making presentations at schools, meeting with interested students and overseeing admissions representatives who met with students. According to CW6, the campus Director of Admissions "pressured her admissions reps. A lot of times they enrolled students who shouldn't have been enrolled… [The students] were kind of pressured and talked down into enrolling." CW6 said the Director was motivated to pressure her reps to pressure students so the campus would meet its enrollment goals. According to CW6, the admissions office was expected to enroll about 25 to 35 students every month. CW6 said a lot of students who were pressured to enroll typically did not show up to start classes or, if they started, they were much more likely to drop out after a month or two.

84.    Corinthian also misrepresented tuition rates to students. **Confidential Witness 7.** CW7 was an Associate Vice President of Compliance for Corinthian's online division from March 2008 to July 2012. CW7's job entailed ensuring the online division was in compliance with internal company policies, DOE regulations and accrediting body requirements. In early 2012, CW7 discovered that the online catalog for continuing students, published for the upcoming term, listed the wrong tuition. The published amount was $500 less per credit hour than the actual cost of tuition. CW7 reported this mistake to Steve Corozzi, Chief Operating Officer of Everest College Phoenix. CW7 calculated that honoring the published price for continuing affected students (about 1,000 students) would cost Corinthian approximately $500,000. CW7 submitted recommendations to address the mistake, including drafting letters to students informing them of mistake and honoring the published price. CW7's proposal was transmitted to

Dave Poldoian, the online division president, as well as Beth Wilson and Ed Johnson, the President of Everest College Phoenix. According to CW7, "the higher ups decided they didn't want to do it. They decided they would not honor that (published) price." Corinthian did not inform students of the mistake. Instead of addressing the problem, the Company deleted the catalog from the system archive of catalogs. Because of this incident, CW7 decided to leave the Company and resigned shortly thereafter. According to CW7, "the DOE could have come in and shut the doors. It was pretty bad."

85.     CW2 stated that admissions staff were trained and pressured to enroll as many students as possible and assessing the students' capabilities to finish the program was no part of the process. As an admissions representative, CW2 was under constant pressure from her boss to keep her enrollment numbers up. If CW2 met with a student who did not enroll, she had to explain it to the director.

86.     CW4 stated that Corinthian fired instructors if too many students failed or dropped out of their classes. CW4 said this put pressure on instructors to pass students who had not learned the skills taught in class or were incapable of learning. According to CW4, many instructors were fired solely because their retention numbers did not meet the Company quota. CW4 also said the pressure to keep enrollments as high as possible caused admissions to take anyone who could sign a piece of paper, regardless of that person's capacity to succeed at school.

## CORINTHIAN'S REGULATORY COMPLIANCE FAILURES

87.     Regulations require Corinthian to: (1) maintain a rate of default by its students on federally guaranteed loans that are below a specified rate (the "cohort default rate" or "CDR"); (2) comply with certain financial responsibility and administrative capability standards; (3) prohibit the payment of certain incentives to personnel engaged in student recruiting, admissions activities or the award of financial aid; and (4) achieve prescribed completion and placement outcomes for certain academic programs.

88.     Specifically, in order to maintain access to federal Title IV funds, institutions like Corinthian must maintain an appropriate cohort default rate ("CDR").

The CDR calculates a percentage of a school's borrowers who enter repayment on federal student loans during a fiscal year and default prior to the end of the next fiscal year. According to the Higher Education Act, schools, "[e]xcept as provided in paragraph (e) of this section, [] lose [] eligibility to participate in the FFEL and Direct Loan programs 30 days after [they] receive our notice that [its] most recent cohort default rate is greater than 40 percent." 34 C.F.R. §§ 668.187; 668.206.

89.     Corinthian's September 3, 2013 Form 10-K explains:

> A significant requirement imposed by Congress is a limitation on participation in the Title IV Programs by institutions whose former students default on the repayment of federal student loans in excess of specified rates ("Cohort Default Rates"). Each "cohort" is the group of students who first enter into student loan repayment during a federal fiscal year (ending September 30). The Cohort Default Rate requirements were modified by the HEOA enacted in August 2008 to increase by one year the measuring period for each cohort. Accordingly, Cohort Default Rates now consist of those students who default on their federal student loans by the end of the second federal fiscal year following the federal fiscal year in which they enter repayment. Starting with the 2009 cohort, if an institution's three-year cohort default rate exceeds 30% for any given year, it must establish a default prevention task force and develop a default prevention plan with measurable objectives for improving the cohort default rate, and may be also subject to provisional certification imposing various additional requirements for participation in Title IV Programs. Starting with the final three-year Cohort Default Rates for the 2011 cohort, expected to be published September 2014, the three-year rates will be applied for purposes of imposing sanctions, as follows:
> •*Annual Rates above 40% for a Single Year.* If the three-year cohort default rate for any given year exceeds 40%, the institution will cease to be eligible to participate in Title IV Programs; and *Three consecutive years above 30%.* If the institution's three-year cohort default rate exceeds 30% (compared to the previous 25% threshold applicable to the two-year cohort default rates) for three consecutive years, beginning with the 2009 cohort, the institution will cease to be eligible to participate in Title IV Programs.

90.     Prior to the June 30, 2012 federal court ruling vacating certain gainful employment measures, Corinthian was also required to meet gainful employment

FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW                                                    31

standards, including (1) at least 35% of the program's former students must be repaying their loans, (2) the estimated annual loan payment of a typical graduate could not exceed 12% of the graduate's total earnings, and (3) the estimated total loan payment of a typical graduate could not exceed 30% of the graduate's discretionary income.

91.    Defendants knew that violating these applicable regulations would risk losing Corinthian's required accreditation and all-important Title IV federal funding eligibility, which would be a corporate death knell for Corinthian because Title IV funds were the life blood of Corinthian's financial success.

92.    Indeed, the vast majority of Corinthian's revenue during the Class Period was generated from federal Title IV financial aid funds. The Company derived as much as 83%, or $1.4 billion, of its annual revenue from Title IV funding during the Class Period.

93.    The materiality of Corinthian's compliance with regulatory compliance is demonstrated by analysts' reports during the Class Period. For example, on January 31, 2013, analyst PAA Research reported with respect to various investigations into the Company's regulatory compliance issues:

> **How Significant Are COCO's Regulatory Tail Risks?**
> COCO is currently under investigation from the Wisconsin AG, the California AG, and the Consumer Finance Protection Bureau. We have no insight into how much the company could be fined for potential transgressions as a result of these investigations, if at all. However, as we have outlined the company has little wiggle room with its lenders and the Department of Education. At this stage, one meaningful fine could make all the difference in COCO's relative financial health.

94.    During the Class Period, the Company continually touted its compliance efforts, stating, for example, in an August 20, 2012 press release, for example, *"[o]n the regulatory front, we continued to implement policies and procedures in response to new federal regulations and remained focused on compliance."* (Emphasis added.)

95.    Despite Defendants' representations, the compliance efforts of the

Company, including the default management program, served only to perpetuate the inherent issues with the Company's high student default rates and low graduation and gainful employment statistics. The Company's compliance measures were in fact nothing more than a small bandage over a deep and festering wound, which jeopardized the Company's core operational health.

### *False and Misleading Statements Regarding Regulatory Compliance*

96.     In order to maintain their all-important Title IV funding, Defendants consistently misrepresented the Company's regulatory compliance throughout the Class Period and failed to disclose that a significant portion of the Company's program failed to meet gainful employment requirements.

97.     In a February 1, 2011 press release, Defendant Massimino stated:

> "We continue to actively monitor proposed changes in federal regulation and take steps to reduce our risk.... For example, we have invested heavily in cohort default management, and we are seeing a marked improvement in default trends. Given the information currently available, *we believe that defaults under the Department of Education's two-year measurement no longer pose a significant risk to the company.*" (Emphasis added.)

98.     On August 23, 2011, the Company issued a press release announcing fiscal year 2011 fourth quarter and annual financial results, quoting Defendant Massimino:

> "We navigated through a number of challenges in fiscal 2011 and made progress in several areas.... We continued to focus on student completion, and we assisted a record number of graduates in finding jobs in their fields of study. In the area of regulatory compliance, we developed and implemented a new compensation program for front-line admissions and student finance representatives and expanded our disclosures related to completion, placement and program costs.... We also continued to increase the efficiency of our back-end operations, particularly in the area of cohort default management and financial aid processing. As a result, *we no longer consider two-year CDRs to be a significant risk for our company.*" (Emphasis added.)

99.     The August 23, 2011 press release also stated with respect to gainful employment compliance:

"The final gainful employment rule was published in June, and we have completed our initial review of the new requirements," Massimino said. "We cannot predict the impact of the rule with certainty, as there are many open questions. *In general, by using Bureau of Labor Statistics data as allowed in the first three years, we expect the vast majority of our short-term diploma programs to meet the required debt-to-income ratios.* For our two-year associate degree programs, we plan to modify the pricing and curriculum structure and replace programs over time. These changes are consistent with our overall growth strategy and we believe they will also help mitigate the impact of the rule." (Emphasis added.)

100.   In the Company's August 24, 2011 Form 10-K for the period ended June 30, 2011, the Company stated the following regarding its compliance efforts:

As of June 30, 2011, we employed approximately 2,400 admissions representatives who work directly with prospective students to facilitate the admissions process. These representatives interview and advise students interested in specific careers and are a key component of our effort to generate interest in our educational services. We conduct semi-annual student satisfaction surveys at our campuses in the United States in which students have consistently given high marks to our admissions personnel for helpfulness, courtesy and accuracy of information. *Because our success is highly dependent on the efficiency and effectiveness of our admissions process, we invest considerable resources to train our admissions representatives in product knowledge, regulatory compliance, and customer service. We also employ various admissions supervisory and monitoring programs, and conduct student surveys which help us ensure compliance with both government regulations and our corporate policies.*

***

In order to improve our overall default rates, we have implemented a multi-faceted cohort default prevention program. This program includes the following: a contact management system to assist in reaching students who are no longer in school; an internal department focused primarily on early stage delinquencies; an expanded program of entrance and exit counseling and financial literacy training for current students; and the use of outside firms and internal resources to reach borrowers and assist them in contacting their lenders and getting help with alternatives to default, including income-based repayment, deferral and forbearance. (Emphasis supplied).

FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW                                                                    34

101.    In a February 25, 2012 Form 8-K, the Company stated:

On an on-going basis, we monitor cohort repayment data, and we are currently monitoring the repayment and default status of the 2010, 2011 and 2012 Cohorts. Given the draft results for the 2010 Cohort (under the two-year measurement methodology), we believe we have significantly reduced the risk of any of our institutions exceeding the 30% threshold for three consecutive years under the new three-year measurement rules. We believe that these positive trends are the result of three main factors: 1) our substantial investment in cohort default prevention over the past two years; 2) stabilization in the student lending environment; and 3) the increased participation of loan servicers in default management.

102.    On February 28, 2012, the Company filed a Form 8-K with the SEC, representing:

On February 25, 2012, the Company received draft Cohort Default Rates from the federal Department of Education ("ED") for students of the Company's institutions who entered repayment during the federal fiscal year ending September 30, 2010 (the "2010 Cohort"). The weighted average of all institutions was 6.7%, a 14.8 percentage point improvement over the weighted average of 21.5% for the Company's institutions who entered repayment during the federal fiscal year ending September 30, 2009 (the "2009 Cohort"). *As anticipated, none of our institutions exceeded the 25% default threshold.* (Emphasis added.)

103.    In contrast, mere days later, on March 9, 2012 after the market closed, the Company filed another Form 8-K with the SEC, representing:

On March 5, 2012, the Company received draft Cohort Default Rates from the federal Department of Education ("ED") for students of the Company's institutions who entered repayment during the federal fiscal year ending September 30, 2009 (the "2009 Cohort"), measured over three federal fiscal years of borrower repayment. (This is a new measurement period. Previously, defaults were calculated over a two-year repayment period.) The weighted average of the Company's institutions was 28.8%, a 7.3 percentage point increase over the 21.5% weighted average for the two-year measurement of the 2009 Cohort. As previously reported, we had expected a majority of our institutions to exceed ED's 30% default rate threshold for the three-year measurement of the 2009 Cohort. *For the 2009 Cohort,*

FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW                                                                                     35

*twenty-five of our forty-nine institutions exceeded the 30% default threshold.* (Emphasis added.)

104.   On this news, on the next trading day, March 12, 2012, Corinthian stock fell $0.06, or 1.38%.

105.   In a May 3, 2012 press release, Defendant Massimino stated, "We have implemented systems and process efficiencies in the areas of financial aid and cohort default prevention which have substantially reduced bad debt and improved default rates."

106.   In an August 20, 2012 press release, Defendant Massimino also stated:

"We also made progress in cohort default prevention and as a result, no longer consider two-year or three-year cohort default rates to pose an immediate risk to our company. On the regulatory front, we continued to implement policies and procedures in response to new federal regulations and remained focused on compliance."

107.   The Company's August 24, 2012 Form 10-K for fiscal year 2012 further stated the following regarding the Company's compliance efforts:

As of June 30, 2012, we employed approximately 2,380 admissions representatives who work directly with prospective students to facilitate the admissions process. These representatives interview and advise students interested in specific careers and are a key component of our effort to generate interest in our educational services. We conduct semi-annual student satisfaction surveys at our campuses in the United States in which students have consistently given high marks to our admissions personnel for helpfulness, courtesy and accuracy of information. *Because our success is highly dependent on the efficiency and effectiveness of our admissions process, we invest considerable resources to train our admissions representatives in product knowledge, regulatory compliance, and customer service. We also employ various admissions supervisory and monitoring programs, and conduct student surveys which help us ensure compliance with both government regulations and our corporate policies.* (Emphasis supplied).

108.   The August 24, 2012 Form 10-K further stated with respect to CDR rates:

On an on-going basis, we monitor cohort repayment data, and we are

FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW                                                                              36

currently monitoring the repayment and default status of the 2010, 2011 and 2012 Cohorts. Given the draft results for the 2010 Cohort (under the two-year measurement methodology), we believe we have significantly reduced the risk of any of our institutions exceeding the 30% threshold for three consecutive years under the new three-year measurement rules. We believe that these positive trends are the result of three main factors: 1) our substantial investment in cohort default prevention over the past two years; 2) stabilization in the student lending environment; and 3) the increased participation of loan servicers in default management.

109.   In a January 31, 2013 conference call relaying second quarter 2013 earnings results, Defendant Massimino stated:

I'll begin with student outcomes. Accreditation agencies are of course one of the main regulatory guardians of educational quality and student outcomes and we continue to meet or exceed their standards during our reaccreditation visit.

During the second quarter seven of our Everest and WyoTech schools received reaccreditation approval. Of those, two had zero findings which is the equivalent of a perfect score from the accreditation agency.

*Over the past few years we have increased the rigor of our internal audit procedures, and as a result we have been successful on reducing the average number of reaccreditation findings per campus.* (Emphasis added.)

110.   On March 11, 2013, in a presentation at the Credit Suisse 15th Annual Global Services Conference, Defendant Massimino stated:

*Accreditation. These are some pretty important issues for us. I mean we pay a lot of attention to this area. You've heard a lot of noise around accreditation here recently. We're pretty proud of where we are.* We've got the Higher Learning Commission reaccredited our programs in Arizona. WASC just approved, as I said earlier, Heald going from WASC Junior to WASC Senior. And on accreditation visits, as I said, we actually measure a number of incidences or issues that come out of every one of our visits. This last year, we had 9 out of 26 schools had 0 findings when the accreditors came to our schools. And the number of findings for us were reduced from 2.8 to 1.5 per visit. I'm just telling you those are really good numbers. (Emphasis added.)

111.   On April 30, 2013, the Company issued a press release announcing financial results for the third quarter ended March 31, 2013, reporting net revenue of $400.2 million, total student population of 87,776, total new students of 26,738, and operating income of $12.6 million.

112.   On April 30, 2013, the Company held a conference call with investors to discuss the results from the recently ended period, and during that conference call the Company stated:

> As we reported in an 8-K on March 25, the weighted average for our institutions was 19%, well below the federal threshold of 30% and 9.2 percentage points below the 28.2% reported for the preliminary three-year measurement of the 2009 cohort. *We've achieved this improvement in part by establishing a robust, in-house cohort default defensive program. Our program includes financial literacy training provided to students while they are in school, counseling related to repayment options and early intervention in the default process.* (Emphasis added.)

113.   On April 30, 2013, the Company filed a quarterly report for the period ended March 31, 2013 on a Form 10-Q with the SEC, where it reiterated the financial results set forth in ¶ 111. The Form 10-Q was signed by Defendants Massimino and Owen, and was also certified by them as to accuracy pursuant to the Sarbanes-Oxley Act of 2002.

114.   The Company's September 3, 2013 Form 10-K stated with respect to compliance:

> In order to maintain acceptable Cohort Default Rates, we have implemented a cohort default prevention program that includes the following: a contact management system to assist in reaching students who are no longer in school; an internal department focused primarily on early stage delinquencies; an expanded program of entrance and exit counseling and financial literacy training for current students; and the use of outside firms and internal resources to reach borrowers and assist them in contacting their lenders and getting help with alternatives to default, including income-based repayment, deferral and forbearance.
>
> Draft Cohort Default Rates are published by ED approximately six months after the end of the measuring period, and final rates are usually

published approximately 12 months after the end of the measuring period. Thus, on March 25, 2013, the Company received draft three-year Cohort Default Rates from ED for students of the Company's institutions who entered repayment during the federal fiscal year ending September 30, 2010 (the "2010 Cohort"), measured over three federal fiscal years of borrower repayment. The weighted average of the Company's institutions was 19.0%, a 9.0 percentage point decrease from the 28.0% weighted average for the three-year measurement of the 2009 Cohort. For the 2010 Cohort, none of our institutions exceeded the 30% default threshold.

115. If CDR rates were not in compliance with regulatory standards, Corinthian would be forced to shut down campuses, lose revenue sources and lose access to vital Title IV funding. To mitigate this risk, Defendants instituted mere stopgap measures, including student loan deferrals and forbearances, to artificially lower the CDR rate, instead of, as Defendants constantly represented, preparing Corinthian graduates for gainful employment in their fields of study.

116. Analyst reports issued during the relevant period evidence the market's acceptance of the Company's misleading statements concerning its cohort default management processes and default rate, as well as statements concerning its regulatory compliance. For example, a September 6, 2011 report by analyst Wunderlich Securities stated with respect to Corinthian:

> **The threat of regulatory annihilation is past.** Two-year cohort default rates are comfortably lower thanks to student outreach…. The company is able to contain the threat posed by gainful employment through a combination of program changes and program closures. More permanent fixes are under way as well, with a change in the pricing structure, diversification in program offerings, greater corporate outreach, and better financial literacy education.

117. In upgrading its rating from underweight to neutral on November 2, 2011, analysts at Piper Jaffray commented:

> Credit to CEO Jack Massimino (who returned to the CEO role a year ago) for implementing the tough strategic and operational changes, including significant cost cutting, program upgrades, and revised enrollment policies, that are now translating into improved enrollment and earnings trends.

118.   A November 2, 2011 report by analyst Wunderlich Securities also reported with respect to Corinthian, "**Short arguments evaporating.** Near-term regulatory threats have been effectively neutralized and the company has reiterated its confidence that cohort default rates for 2010 will not be an issue."

119.   A February 2, 2012 report by analyst Wunderlich Securities further reported:

> Corinthian College's (COCO) strong quarterly results have enhanced the credibility of management's FY12 EPS guidance and bolstered our argument that on a calendar year basis, EPS could be nearly double the fiscal year amount. A host of changes made by management has both enhanced the appeal of the company's offerings as well as positioned the business model to maximize the margin leverage from even modest growth moving forward. ***Regulatory obstacles are greatly diminished and the company's operations have, in our opinion, turned the corner.*** We are reiterating our Buy rating and raising our price target to $6.00.
>
> **Regulatory seas are calmer.** The company offered reassurance that preliminary CDRs reported in February would not create a challenge. It cited a favorable outcome for its regionally accredited Everest Phoenix campus, positive support for its efforts to add test prep to existing program offerings (enhancing non Title IV revenue streams), and pending plans to upgrade its Heald accreditation to allow for BA degrees, which would then permit Heald Online to emerge from its relatively nascent state.
>
> **Despite run, upside potential remains.** Corinthian's business has turned a corner, first in Q2 with positive EPS and we are confident in Q3 with positive start growth. Regulatory risks remain a fact of life given the challenged population its institutions serve. However, managing effectively in the context of regulation remains a core skill set of this management team, and, in our opinion, investors may invest in the company's earnings growth, while still maintaining a healthy skepticism regarding the stock's long-term P/E multiple. (Emphasis added.)

### *Why Defendants' Statements Were False and Misleading*

120.   Defendants' statements concerning Corinthian's compliance with regulatory requirements were misleading because Corinthian failed to comply with legal

FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW                                                          40

requirements governing access to federal education funds, including requirements with respect to admissions, attendance, academic progress and prohibitions on recruiting misrepresentations. Defendants' statements were false in light of misleading recruiting claims, manipulated admissions practices, widespread alteration of failing grades, and the retention of non-attending and failing students.

121.   With respect to Defendants' statements of compliance with respect to its CDR rates, as explained in the Harkin Report, Corinthian uses manipulative tactics to attempt to lower its CDR rates. The Report explained:

> Moreover, as discussed below, some for-profit education companies use default management tactics that may cross the line to default manipulation and place former students in forbearances or deferments so that these students do not show up in the companies' reported default rates.
>
> ***
>
> [T]wo key regulatory provisions impose some measure of accountability on for-profit colleges: the weakened 90/10 rule, and the requirement that no more than 30 percent of students default within 3 years. Data and internal documents indicate that some for-profit schools go to great lengths to evade these modest checks. The two primary Federal checks on for-profit colleges pertain to the proportion of Federal money that the colleges collect and the percentage of students who default on Federal student loans. In addition, some accreditors also require schools to meet standards regarding the percentage of graduates who obtain employment in their field of study. Some for-profit colleges employ questionable tactics to meet these requirements.... Default management tactics involve aggressively signing students up for forbearance and deferment plans. Job placement statistics have been plagued by irregularities and sometimes falsified data.

122.   The Harkin Report concluded that the Company's aggressive lending and recruiting practices resulted in a student body that is underprepared for college, generally unable to obtain gainful employment, and laden with a significant amount of debt. Indeed, the Company's student population has one of the highest default rates in the country,  and is at risk of losing its eligibility for Federal financial aid as a result of its extremely high default rate. The Report stated:

> Corinthian's default rate has similarly increased, growing from 22.9 percent

FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW

41

for students entering repayment in 2005 to 36.1 percent for students entering repayment in 2008. This is by far the highest default rate of any publicly traded company examined, and the second highest overall. The default rate is 64 percent higher than the rate for all for-profit colleges. While the company's high default rate is likely due in part to the high cost of Corinthian's programs, it also raises serious questions regarding the quality of the programs Corinthian provides, and whether its students who complete programs earn high enough wages to repay the debt they take on. Had the 3-year cohort default rate provision been in effect in 2011, Corinthian would have faced the loss of access to title IV financial aid dollars.

123.   The Harkin Report strongly questioned the Company's use of "default management" programs in an attempt to prevent revocation of Corinthian's Federal financial aid eligibility. The default management program however did not actually solve the issue of loan defaults, but instead placed student loans on deferment and forbearance, to allow the Company to account for these loans as performing and not in default, thus maintaining the appearance of compliance with federal regulations. The Report stated:

> Corinthian has focused significant resources on finding ways to eliminate students from its reported default rates. Helping get delinquent students into repayment, deferment, or forbearance prior to default is encouraged by the Department of Education. However, many for-profit colleges appear to be investing in aggressive tactics for the sole purpose of ensuring that borrowers do not default within the 3-year regulatory window.

> Default management is primarily accomplished by putting students who have not made payments on their student loans into temporary deferments or forbearances. While the use of deferment and forbearance is fairly widespread throughout the sector, documents produced indicate that a number of companies also pursue default management strategies that include loan counseling, education, and alternative repayment options. Default management contractors are paid to counsel students into repayment options that ensure that students default outside the 2-year, soon to be 3-year, statutory window in which the Department of Education monitors defaults.

124.   The Harkin Report criticized the deferment and forbearance programs as especially detrimental to the long term prospects of students, as these programs usually

have negative long term financial consequences for the student-borrower, who will incur larger long term borrowing costs, while the Company can report lower student default rate and offer a rosier picture to investors and federal regulators. The Report concluded:

> Evidence suggests that some for-profit colleges use forbearance and deferment as tools to move the school's default rate, without concern for a students' particular situation or whether it is in the best financial interest of the individual. Many students will end up paying more over the life of their loan after a forbearance or deferment.

125. The Harkin Report also noted that the Company failed to meet gainful employment criteria:

> On June 26, 2012, the first set of data from the Department of Education, regarding the gainful employment regulations, indicated that 5 percent of programs (193 programs at 93 institutions) all operated by for-profit colleges failed to meet all three gainful employment criteria. These three standards include: (1) at least 35 percent of the program's former students are repaying their loans; (2) the estimated annual loan payment of a typical graduate does not exceed 12 percent of his or her total earnings; and (3) the estimated annual loan payment of a typical graduate does not exceed 30 percent of his or her discretionary income. According to analysis from *Inside Higher Ed*, Corinthian was the company with the most programs, 43 in total, failing all three criteria.

126. Furthermore, according to the Harkin Report, Corinthian has particularly troubling default rates:

> Corinthian Colleges, the company with the highest default rates among any large for-profit operator, saw 23,623 of its students who entered repayment in 2008 default on a Federal student loan. Among all the students leaving Corinthian-owned schools from 2005–8, over 73,000 defaulted.

127. As one analyst, PAA Research, explained in an August 18, 2012 report:

> **Elevated 2-year cohort default rates**. COCO has managed its 2-year cohort default rates down from 21% for FY09 to less than 7% for FY10. This reduction in the CDR has been achieved entirely through more aggressive "management" (aka forbearance and deferment) of these loans. Even management would acknowledge that there has been no improvement

FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW                                                        43

in ACTUAL student outcomes despite the dramatic reduction in cohort default rates. More recently, the company has started to pursue the "OPEID gerrymandering" strategy that was successfully instituted at ESI to avoid regulatory implications from the 3-year cohort default rate standards. Deferment and forbearance are unlikely to be as effective in "managing" down 3-year cohort default rates.

128.   Thus, instead of seeking to attract cash-paying students or employers by offering quality programs, Corinthian devised a number of tactics to lower its reported CDR figures. For example, Defendants raised Corinthian's tuition rates, established an institutional loan program and paid employees bonuses based on stopgap default prevention measures.

129.   The Harkin Report explained:

> This practice is troubling for taxpayers. The cohort default rate is designed not just as a sanction but also as a key indicator of a school's ability to serve its students and help them secure jobs. If schools actively work to place students in forbearance and deferment, that means taxpayers and policymakers fail to get an accurate assessment of repayment and default rates. A school that has large numbers of its students defaulting on their loans indicates problems with program quality, retention, student services, career services, and reputation in the employer community. Aggressive default management undermines the validity of the default rate indicator by masking the true number of students who end up defaulting on their loans. Critically, schools that would otherwise face penalties—including loss of access to further taxpayer funds—continue to operate because they are able to manipulate their default statistics.

130.   Testimony from confidential witnesses confirms that the Defendants knew about the Company's numerous regulatory compliance woes and further confirms Defendants' knowledge and access to information with respect to the numerous compliance issues.

131.   **Confidential Witness 8.** CW8 worked as a manager in the default prevention department at Corinthian from May 2009 to October 2012. CW8 stated that Corinthian students' high loan default rates were of concern to the Company throughout her employment there. CW8 understood that the default rates of multiple Corinthian

campuses were in excess of the maximum allowed by the Department of Education for schools to receive Title IV funds. CW8 said, "Everyone knew it was an issue. It was all hands on deck to get the numbers down. Everyone was extremely concerned about the numbers." According to CW8, the Company was so concerned that it hired hundreds of employees to staff three new call centers that exclusively focused on tracking down students who were delinquent on their loans and preventing them from going into default by applying for deferment or forbearance.

132.   **Confidential Witness 9.** CW9 was Manager of Operations and Reporting in Corinthian's student loan default prevention department from September 2010 to February 2012. CW9 claims that Defendant Massimino was aware of and discussed Corinthian's student loan default rate problems at quarterly employee meetings. CW9 also stated that Defendants Owen and Ord, as well as other top executives, were also at the quarterly meetings. According to CW9, as part of Corinthian's student loan default prevention program, the Company collected loan data from federal loan servicers and used it to create a database of students who were delinquent on their loans. CW9 said that Corinthian's top executives were aware that many Corinthian schools had default rates that exceeded the Department of Education's threshold set for eligibility for federal financial aid. CW9 said that his superiors, including Vice Presidents in the Chief Operating Officer's office, commonly referred to the out-of-compliance default rates as an "enterprise risk" because, if the rates were not brought into DOE compliance, campuses would have to be closed and that would threaten the Company's financial viability.

133.   Furthermore, according to CW7, several programs did not meet accreditation requirements, and that all audits conducted at the schools were sent to Defendant Massimino. CW7 said that the low job rate placement problem was well known to the Company's senior executives. According to CW7, every time the DOE conducted a program review or audit of Corinthian's online division, the regulatory agencies found compliance issues in various areas. CW7 specifically recalled that the

DOE found problems in student financial aid files, such as missing documentation and that Corinthian's procedures were not followed properly. Furthermore, CW7 recalls that the DOE found the school's Satisfactory Academic Progress calculations were not done correctly and that students who do not meet SAP requirements lose eligibility for federal Title IV funds.

134. **Confidential Witness 10.** CW10 was an internal auditor at Corinthian from March 2012 to May 2013. He reported directly to the Vice President of Internal Audit. CW10 stated that the Company conducted an internal audit of each individual campus every fiscal year. CW10 stated that summaries of the reports were sent to Defendants Massimino, Owen and Ord; the summary included a list of each campus' violations of government regulations, company policies and accrediting bodies' requirements. CW10 stated that the audits looked at multiple items, including admissions numbers, student retention rates, grades, attendance, graduation rates, job placement rates and financial aid procedures. CW10 said that Corinthian schools were regularly found to be in violation of company policies, government regulations, including those promulgated in June 2011, and accrediting body requirements.

135. **Confidential Witness 11.** CW11 was Director of Student Services and Academic Dean at an Everest University campus in Arizona from August 2009 to April 2012. CW11 was involved heavily in dealing with DOE Satisfactory Academic Progress requirements. CW11 stated that the new DOE regulations in 2011 required students to maintain a 2.0 GPA and make timely progress through an academic program to be eligible for financial aid. According to CW11, Corinthian devised a system that allowed students to remain in school and continue to collect financial aid even if they did not meet the GPA and progress requirements.

136. **Confidential Witness 12.** CW12 was a Regional Director of Education, New Branches, from December 2009 to May 2012. CW12 reported to reported to Corinthian's Vice President of Operations, who was based at the Santa Ana headquarters. CW12 stated that the Company's computer database system tracked

FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW                                                                     46

teachers' grading and student attendance to measure teachers' retention and grading patterns and determine whether teachers were failing to meet retention quotas. CW12 said faculty managers could cross reference attendance rates with grades as well measure dropout and failure rates. According to CW12, when schools went into or were close to non-compliance with government regulations or accrediting bodies, she reported it to the Division President. CW12 stated that many Corinthian schools frequently did not meet the required benchmarks, and she reported those failing numbers to her manager at least once a week.

137. **Confidential Witness 13.** CW13 was President of an Everest University campus in Illinois from February 2006 to July 2012. According to CW13, teachers were placed on performance improvement plans and threatened with termination if they failed to meet student retention quotas for their classes. CW13 said he believed this policy led instructors to pass students who otherwise might not have passed. According to CW13, Corinthian schools that were out of compliance with government regulations or accrediting bodies' requirements reported their failing numbers to management on a regular basis. CW13 says that Corinthian's Senior Vice President of Operations attended to campuses that were out of compliance on job placement rates. CW13 said that several Corinthian schools in the Chicago, Illinois area were regularly out of compliance for job placement rates during his employment. CW13 explained that Corinthian's computer software system, called Campus Vu, tracked a wide range of metrics at the Company's schools and allowed management to run reported at any time showing the categories where campuses were out of compliance. According to CW13, even though the DOE required students to maintain a 2.0 GPA and progress at a rate that ensured graduation within 150% of the designated program length to remain eligible for financial aid, Corinthian created a system that allowed students to stay in school and collect financial aid even if they were not meeting DOE requirements.

138. **Confidential Witness 14.** CW14 was Vice President and President of three different campuses of Everest University in the Chicago, Illinois area from July 2006 to

FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW

47

February 2013. According to CW14, top Company executives led Quarterly Compliance Calls, during which schools that were out of compliance with government regulations, accrediting body requirements or internal policies were required to report on the situation. CW14 said that campus presidents were required to submit to the Regional Vice President every week a Friday report of the individual school's numbers for admissions, enrollments, attrition, graduation, job placement and financial aid and budget. Each Monday, the Division President led a conference call with Regional Vice Presidents, Division and Regional Directors and Campus Presidents in which the Friday reports were discussed and any problems in the weekly numbers revealed. Furthermore, each campus was subjected to an internal audit annually, including findings of how the campus was out of compliance with government regulations, accrediting body requirements and internal policies. According to CW14, the results of internal audits of every campus and any subsequent action plan were copied to Defendant Massimino and other top executives, and  the corporate office tracked student loan default rate numbers and provided reports on the rates to the campuses.

139.   **Confidential Witness 15.** CW15 was a Student Services Coordinator for Everest University Online from January 2012 to June 2012 and from August 2012 to December 2012. According to CW15, "in order for the school to get its government money, they needed that attendance and grades [to meet requirements]. The school just wanted the money." Attendance statistics were calculated automatically in the school's computer system, and the statistics were accessible to CW15 and her superiors. Criteria that qualified as attendance were very lax – for example, posting a smiley face as a response on a discussion board counted toward attendance. According to CW15, right before she began working at Everest, the Company changed its policy with respect to providing evidence of a high school diploma and no longer required students to submit a diploma. Instead, the Company required the student to fill out and sign a form listing the high school they attended. Everest only required employees to confirm that the high school existed and that it was accredited. No check was performed to confirm whether

FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW                                                         48

the student attended or graduated. According to CW15, the graduation rate from the Everest's online program was miniscule; CW15 estimated less than 20 percent graduated from the school.

### THE TRUTH EMERGES

140.   Through a series of partial corrective disclosures, the true facts regarding Corinthian's job placement rates, enrollment practices and regulatory compliance issues emerged.

141.   The Company's May 4, 2011 Form 10-Q disclosed that Corinthian was subject to several investigations and potential litigation with several government authorities:

> On March 28, 2011, the Company received a letter from the California Attorney General's Office (the "CA AG's Office") ostensibly seeking information pursuant to the Stipulated Judgment agreed to by the Company and the CA AG's Office in July 2007. The letter requests information and documentation related to (i) the discontinuation of certain programs immediately after the Stipulated Judgment, (ii) numbers of new students, graduating students and discontinuing students, by program, (iii) marketing and solicitation materials, (iv) enrollment agreements and disclosures, (v) graduating students' employment and compensation, (vi) transferability of credit by the Company's former students, (vii) training provided to employees pursuant to the Stipulated Judgment, and (viii) disciplinary actions against certain categories of employees. The Company expects to cooperate with the CA AG's reasonable requests for information, but it has objected to certain overly broad requests which appear to be unrelated to the 2007 Stipulated Judgment.

> On April 29, 2011, the Company's Everest Institute campuses in Brighton and Chelsea, Massachusetts received civil investigative demands from the Massachusetts Attorney General's Office (the "MA AG's Office") seeking (i) information about past students who have enrolled in each institution, (ii) the identity of recruiters, (iii) recruiting and enrollment documents, (iv) documentation related to analyses of delinquency, default, drop out, refund, loan forgiveness or reduction, placement, student income, and/or any student's ability to repay loans, and (v) cohort default and graduation rates. The Company expects to cooperate with the MA AG's reasonable

requests for information.

On April 11, 2011 the Company's Everest Institute in Jonesboro, Georgia was sent a subpoena from the Atlanta office of ED's Office of Inspector General (the "OIG") requesting documents related to the Jonesboro campus's employment and placement rates reported to its accrediting agency, as well as correspondence with the accrediting agency. The Company is cooperating with the OIG's request. On April 14, 2011 the Company's Everest Institute campus in Silver Spring, Maryland received a letter from the Mid-Atlantic regional office of the OIG requesting original certificates of diplomas, graduate diplomas in education and/or proof of Ability to Benefit for all students and a complete list of all instructors with documentation of their professional licenses and credentials. The Company is cooperating with the OIG's request.

142.   On this news, Corinthian stock dropped $0.12, or 2.78%, to close at $4.19 on May 4, 2011.

143.   The Company's August 24, 2011 Form 10-K also disclosed additional investigations:

On April 14, 2011 the Company's Everest Institute campus in Silver Spring, Maryland received a letter from the Mid-Atlantic regional office of the OIG requesting original certificates of diplomas, graduate diplomas in education and/or proof of Ability to Benefit for all students and a complete list of all instructors with documentation of their professional licenses and credentials. The Company is cooperating with the OIG's request.

On July 19, 2011, the Company's attorneys met with representatives of the Oregon Attorney General's Office ("OR AG") in anticipation of a written request for information related to the Company's Everest Institute campus in Tigard, Oregon and the Everest College and Heald College campuses in Portland, Oregon. The Company was informed that the investigation is not the result of student complaints regarding the campuses. On August 11, 2011, the Company received a civil investigative demand from the Oregon Attorney General's Office requesting information and documents regarding advertising; student recruitment; admissions; licensure and accreditation; compensation, training and evaluations of admissions personnel; job opportunities and placements of graduates; student complaints; and various other matters. The Company expects to cooperate with the OR AG's reasonable requests for information.

144. On this news, Corinthian stock fell $0.06, or 3.06%, to close at $1.90 on August 24, 2011.

145. The Company's November 3, 2011 Form 10-Q disclosed with respect to investigations:

> On May 19, 2011, along with other private sector education companies, the Company received a subpoena from the New York Attorney General's Office (the "NY AG's Office") seeking information on potential issues related to financial aid, admissions, students, securities and other areas. The Company is cooperating with the NY AG's reasonable requests for information.

146. In the Company's February 2, 2012 Form 10-Q, the Company disclosed that it was subject to several investigations and potential litigation with several government authorities:

> On December 15, 2011, after other private sector education companies had received similar requests, the Company received a civil investigative demand from the Illinois Attorney General's Office (the "IL AG") seeking information on potential issues related to financial aid, admissions, students and other areas. The Company is cooperating with the IL AG's reasonable requests for information.

147. In its May 4, 2012 10-Q, the Company further disclosed with respect to another investigation by a governmental agency:

> On April 3, 2012, the Company was served with a Civil Investigative Demand ("CID") from the U.S. Consumer Financial Protection Bureau ("CFPB"). The CID stated that its purpose is to "determine whether for-profit postsecondary companies, student loan origination and servicing providers, or other unnamed persons, have engaged or are engaging in unlawful acts or practices relating to the advertising, marketing, or origination of private student loans." The CID contains extensive interrogatories and document production demands related to the Company's involvement with student loans and many other aspects of the Company's business. The Company has contacted the CFPB regarding the CID and has retained outside counsel to assist it in this matter. The Company expects to provide documents and other information to the CFPB, while also preserving its rights to object to the inquiry.

148. While disclosing this investigation, the Company maintained that it "believes that its acts and practices relating to student loans are lawful and essential to preserving our students' access to post-secondary education."

149. On this news, on the next trading day, May 7, 2012, Corinthian securities declined approximately 3%, to close at $2.93 per share.

150. On June 26, 2012, the DOE released Corinthian's inadequate gainful employment statistics. Corinthian stock fell dramatically that day, plunging $0.24 or 8.6%, to close at $2.54.

151. On July 30, 2012, the Congressional committee headed by Senator Thomas Harkin issued the Harkin Report which was highly critical of the for-profit education sector, and which included specific findings concerning, among other things, information specific to Corinthian's predatory and aggressive tactics with respect to student enrollment, and its questionable tactics to reduce its CDRs.

152. Due to the misconduct uncovered by the government's investigation of Corinthian, the Harkin Report recommended significant changes to the for-profit college industry, including:

      a. Enhancing transparency by improving data on student outcomes, job placements and earnings, cost of attendance and private lending;

      b. Strengthening oversight of the for-profit college industry by introducing outcomes-based thresholds, limiting use of federal financial aid dollars, improving cohort default rate tracking, ensuring quality through the 90/10 Rule, and changing access to federal financial aid; and

      c. Introducing meaningful protections by improving the complaint process, making students whole by outlawing the use of arbitration clauses, mandating minimum standards for student services, introducing compensation-based policies, and increasing government enforcement.

153. The disclosure of the Harkin Report caused the price of Corinthian securities to fall 6.4% or $0.13 to close at $1.89 on July 30, 2012.

FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW

154. On January 31, 2013, the Company issued a press release disclosing its receipt of a subpoena from the California AG:

> During the second quarter ended December 31, 2012, we received an investigative subpoena from the California Attorney General which requires the production of a broad range of documents and other items related to cohort default rates, placement and completion data, marketing, admissions, enrollment and financial aid processes, and other matters. The subpoena appears to be part of a broader investigation of the for-profit education industry in California.

155. On this news, Corinthian securities declined $0.16 per share or 6.1%, to close at $2.46 per share on January 31, 2013.

156. On June 10, 2013, the Company issued a press release disclosing its receipt of a subpoena from the SEC:

> On June 6, 2013, Corinthian Colleges, Inc. (the "Company") received a subpoena from the Securities and Exchange Commission ("SEC"). In a letter accompanying the subpoena, the SEC stated that it is conducting an investigation of the Company. The SEC's subpoena requests the production of documents and communications that, among other things, relate to student information in the areas of recruitment, attendance, completion, placement, defaults on federal loans and on alternative loans, as well as compliance with U.S. Department of Education financial requirements, standards and ratios (including the effect of certain borrowings under the Company's credit facility on the Company's composite score, and 90/10 compliance), and other corporate, operational, financial and accounting matters. The Company intends to cooperate with the SEC in its investigation.

157. On this news, Corinthian securities declined $0.33 per share or nearly 12%, to close at $2.46 per share on June 11, 2013.

158. On July 16, 2013, outside director Leon Panetta resigned from the Board of Directors, specifically citing Corinthian's ongoing legal and administrative challenges.

159. Shortly thereafter, on August 5, 2013, Corinthian's Executive Vice President of Legislative and Regulatory Affairs, Mark Pelesh, resigned.

160. On October 11, 2013, the Company revealed that the California Attorney

General filed a complaint against Corinthian and its various subsidiaries in California state court for, inter alia, untrue and misleading representations, unfair competition and securities fraud violations. As detailed herein, the Complaint revealed new and previously undisclosed facts regarding Defendants' misrepresentation and omissions with respect to job placement rates.

161.   In response to the news of the lawsuit filed by the California Attorney General, the Company's stock price fell approximately 4%, closing at $1.96 per share. The drop in Corinthian's stock price was unrelated to industry-specific news. In fact, the same day, the stock price for Corinthian's competitors in the for-profit education industry rose that day. ITT Educational Services gained 1.2% to $36.87, Apollo Group rose 0.3% to $20.36, and Devry was up 0.85% at $31.93.

## ADDITIONAL SCIENTER ALLEGATIONS

162.   As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Corinthian, their control over, and/or receipt of modification of Corinthian's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Corinthian, participated in the fraudulent scheme alleged herein. Specifically, internal Corinthian emails and facts provided by Lead Plaintiff's confidential witnesses establish that the Defendants were aware of, or recklessly disregarded, material adverse facts that contradicted their public statements to the investing public concerning the Company's compliance with federal and state regulations and job placement rates. Furthermore, the Individual Defendants were on notice of Corinthian's past problems with deceptive admission practices as a result of prior litigation and government investigations.

163.   In addition, Defendants were motivated to make the misrepresentations and omissions alleged herein.

164.   The Individual Defendants' bonus compensation hinged specifically on (i) Corinthian's compliance with applicable regulations and (ii) the company's operating

FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW                                                    54

profit target, which was based in large part on revenues derived from student enrollments. Defendant Massimino's bonus compensation awarded in 2011 was based on performance criteria including "regulatory compliance requirements and an operating profit target for the Company. Among other criteria, regulatory compliance includes meeting certain student outcome objectives." Furthermore, the bonus compensation for the Individual Defendants in 2012 was conditioned similarly, as the Company explained in a June 25, 2013 Form 8-K: "The performance criteria for the executive officers, including 'named executive officers,' *consist of operating profit and a regulatory compliance 'gate' based on internal audit results. Threshold levels of operating profit and regulatory compliance must be achieved for any bonus payout to occur for any of the Company's executive officers.* With respect to operating profit, if performance is attained at a level between threshold and target, or between target and maximum, then the applicable factor for the calculation of the cash payment attributable to operating profit will be interpolated between those two levels on a straight linear basis." (Emphasis added.) In 2012 alone, Defendant Massimino received a cash bonus under this payment structure of $1,027,000.

165.   The Harkin Report noted that 75% of Massimino's compensation was based on operating profit performance.

166.   The Individual Defendants engaged in insider trading in Company stock during the Class Period, improperly benefitting from their misrepresentations to investors and Corinthian's artificially inflated stock price by selling shares of Corinthian common stock, as follows:

| Name | Date | Amount Traded | Add/Dispose | Price | Total | Total Holdings |
|---|---|---|---|---|---|---|
| Jack Massimino | 3/17/2011 | 2,293 | D | $4.50 | $10,318.50 | 232,834 |
| Jack Massimino | 8/26/2012 | 27,510 | D | $2.19 | $60,246.90 | 745,834 |
| Jack Massimino | 11/14/2012 | 18,927 | D | $2.13 | $40,314.51 | 726,397 |
| Jack Massimino | 8/23/2013 | 39,459 | D | $2.69 | $106,144.71 | 686,938 |
| Jack Massimino | 8/26/2013 | 28,185 | D | $2.63 | $74,126.55 | 658,753 |
| Kenneth S. Ord | 3/17/2011 | 1,418 | D | $4.50 | $6,381.00 | 65,981 |
| Kenneth S. Ord | 11/17/2012 | 2,583 | D | $2.13 | $5,501.79 | 166,704 |
| Kenneth S. Ord | 8/23/2013 | 7,642 | D | $2.69 | $20,556.98 | 159,062 |
| Kenneth S. Ord | 8/26/2013 | 5,299 | D | $2.63 | $13,936.37 | 153,763 |
| Robert C. Owen | 3/17/2011 | 1,533 | D | $4.50 | $6,898.50 | 32,939 |
| Robert C. Owen | 8/26/2011 | 28,750 | D | $0.00 | $0.00 | 60,077 |
| Robert C. Owen | 11/17/2011 | 1,612 | D | $2.71 | $4,368.52 | 31,327 |
| Robert C. Owen | 8/26/2012 | 3,515 | D | $2.19 | $7,697.85 | 102,562 |
| Robert C. Owen | 8/28/2012 | 846 | D | $2.09 | $1,768.14 | 101,716 |
| Robert C. Owen | 11/17/2012 | 1,612 | D | $2.13 | $3,433.56 | 100,104 |
| Robert C. Owen | 8/26/2013 | 3,601 | D | $2.63 | $9,470.63 | 90,740 |
| Robert C. Owen | 8/23/2013 | 5,763 | D | $2.69 | $15,502.47 | 94,341 |

167.   The resignations of key officers and directors of the Company, as well as the suspicious timing of those resignations, also evidence scienter. Six days after the announcement of the SEC investigation into the Company, outside director Leon Panetta resigned from the Board of Directors, specifically citing Corinthian's ongoing legal and administrative challenges. Panetta resigned a mere *eleven weeks* after joining Corinthian's Board. Approximately two weeks later, Corinthian's Executive Vice President of Legislative and Regulatory Affairs, Mark Pelesh, also resigned his position.

## APPLICABILITY OF THE FRAUD-ON-THE-MARKET DOCTRINE

168.   At all relevant times, the market for Corinthian common stock was an efficient market for the following reasons, among others:

   a.   Corinthian stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

   b.   The Company had approximately 87 million shares outstanding as of November 1, 2013, the last time it filed a financial report with the SEC. During the Class Period, Corinthian stock was traded on an active and broad market, permitting a strong presumption of an efficient market;

   c.   As a regulated issuer, Corinthian filed periodic public reports with the SEC;

d. Corinthian regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e. Corinthian was followed by many securities analysts, who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

f. Numerous National Association of Securities Dealers member firms were active market-makers in Corinthian stock at all times during the Class Period; and

g. Unexpected material news about Corinthian was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

169. As a result of the foregoing, the market for Corinthian common stock promptly digested current information regarding Corinthian from publicly available sources and reflected such information in Corinthian's stock price. Under these circumstances, all purchasers of Corinthian common stock during the Class Period suffered similar injury through their purchase of Corinthian common stock at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

170. Corinthian's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability. To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they are excluded from the protection of the

1   statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

2       171.   Defendants are also liable for any false or misleading FLS pleaded because,

3   at the time each FLS was made, the speaker knew the FLS was false or misleading and

4   the FLS was authorized and/or approved by an executive officer and/or director of

5   Corinthian who knew that the FLS was false. In addition, the FLS were contradicted by

6   existing, undisclosed material facts that were required to be disclosed so that the FLS

7   would not be misleading. Finally most of the purported Safe Harbor warnings were

8   themselves misleading because they warned of "risks" that had already materialized or

9   failed to provide meaningful disclosures of the relevant risks.

## LOSS CAUSATION

10      172.   The market for Corinthian shares was open, well-developed, and efficient at

11  all relevant times. During the Class Period, as detailed herein, Defendants engaged in a

12  course of conduct and a scheme to deceive the market that artificially inflated Corinthian

13  shares and operated as a fraud or deceit on Class Period purchasers of Corinthian shares

14  by misrepresenting the Company's then current state of affairs. Defendants achieved this

15  facade by making knowing misrepresentations and/or omissions about, among other

16  things, the performance and volume of student enrollments, the employment statistics of

17  graduates, and Corinthian's regulatory compliance.

18      173.   As detailed above, at the end of the Class Period, when Defendants' prior

19  misrepresentations became known to the public, the price of Corinthian shares fell

20  precipitously, as the prior artificial inflation came out of the price of the shares. Lead

21  Plaintiff and other members of the Class purchased or otherwise acquired Corinthian

22  shares relying upon the integrity of the market price of Corinthian shares and market

23  information regarding Corinthian. As a result of their purchases of Corinthian shares

24  during the Class Period, Lead Plaintiff and other members of the Class suffered

25  economic loss, *i.e.*, damages, under the federal securities laws.

26      174.   By improperly concealing their conduct, Defendants presented a misleading

27  picture of Corinthian's financial condition, revenues, the growth, performance, and near-

28

term prospects during the Class Period. Thus, instead of disclosing the truth about these matters, Defendants caused Corinthian to conceal the truth. These actions caused Corinthian shares to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

175.   The timing and magnitude of the decline in Corinthian's publicly traded securities negates any inference that the loss suffered by Lead Plaintiff and other Class members were caused by changed market conditions, macroeconomic factors or Company-specific facts unrelated to Defendants' fraudulent conduct. As a result of their purchased of Corinthian's publicly traded securities during the Class Period, Lead Plaintiff and other Class members suffered economic loss, *i.e.*, damages, under the federal securities law when the above-described revelations reached the market and the artificial inflation was removed.

176.   Analysts' reports confirm the negative impact and the market's reaction to the corrective disclosures alleged herein.

177.   On June 10, 2013, analyst BMO Capital Markets reported with respect to the recently announced SEC investigation:

> Today after the close COCO filed an 8K disclosing that on June 6, 2013 it received an SEC subpoena.
> **Our View:**
> \* The subpoena requests the production of documents relating to student recruitment, attendance, completion, placement, defaults on federal loans and on alternative loans, as well as compliance with US Department of Education financial requirements, standards and ratios (including 90/10 compliance), and other corporate, operational, financial, and accounting matters.

178.   On June 11, 2013, analysts at Bank of America Merrill Lynch reported:

> **Corinthian announces broad SEC investigation**
> After the market close, Corinthian announced that it is being investigated by the SEC. The SEC has requested documents related to student recruitment, completion, placement, and default rates on

FIRST AM. CLASS ACTION COMPL. FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 2:13-CV-07466-GHK-PJW                                                                    59

federal & private loans. In addition, it is looking into compliance with Department of Education (ED) requirements and ratios (e.g., 90/10 ratio and financial responsibility score). ***In our view, the SEC investigation creates an additional overhang for a company dealing with various regulatory issues.*** (Emphasis added.)

179.  In an October 11, 2013 report, analyst BMO Capital Markets reported:

This morning, COCO filed an 8-K disclosing that a new civil complaint had been filed against the company by the California Attorney General's (AG) Office.

**Our View:**

- The suit alleges false and predatory advertising, intentional misrepresentation to students, securities fraud, and unlawful use of military seals (i.e., emblems and insignias) in advertisements.

- The AG is seeking a wide range of unspecified damages, including reimbursement for students and holders of common stock, in addition to multiple civil penalties.

- This lawsuit is part of a broader investigation of the entire for-profit higher education industry. COCO has been under investigation by the California AG since December 2012, which also subpoenaed Bridgepoint Education (BPI, $18.12; Market Perform) in July 2013.

- While civil investigations are common in this industry, we believe the actual filing of a complaint is a more serious matter.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

180.  Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Corinthian securities during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

181.  The members of the Class are so numerous that joinder of all members is

impracticable. Throughout the Class Period, Corinthian securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Corinthian or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

182. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

183. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

184. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Corinthian;
- whether the Individual Defendants caused Corinthian to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Corinthian securities during the Class Period were

artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

185. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

186. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Corinthian securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Lead Plaintiff and members of the Class purchased, acquired and/or sold Corinthian securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

187. Based upon the foregoing, Lead Plaintiff and the members of the Class are

entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

### (*Against All Defendants*)

188. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

189. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

190. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Corinthian securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire Corinthian securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

191. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the

media that were designed to influence the market for Corinthian securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Corinthian's finances and business prospects.

192. By virtue of their positions at Corinthian, and their review and receipt of and access to internal reports, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

193. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Corinthian, the Individual Defendants had knowledge of the details of Corinthian's internal affairs.

194. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Corinthian. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Corinthian's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Corinthian securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Corinthian's business and financial condition which were

concealed by Defendants, Lead Plaintiff and the other members of the Class purchased or otherwise acquired Corinthian securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

195.    During the Class Period, Corinthian securities were traded on an active and efficient market. Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Corinthian securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true value of Corinthian securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class. The market price of Corinthian securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

196.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

197.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violations of § 20(a) of the Exchange Act

### (*Against the Individual Defendants*)

198. Lead Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

199. During the Class Period, the Individual Defendants participated in the operation and management of Corinthian, and conducted and participated, directly and indirectly, in the conduct of Corinthian's business affairs. Because of their senior positions, they knew the adverse non-public information about Corinthian's misstatements.

200. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Corinthian's business operations and results and to correct promptly any public statements issued by Corinthian which had become materially false or misleading.

201. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Corinthian disseminated in the marketplace during the Class Period concerning Corinthian's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Corinthian to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Corinthian within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Corinthian securities.

202. Each of the Individual Defendants, therefore, acted as a controlling person of Corinthian. By reason of their senior management positions and/or being directors of Corinthian, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Corinthian to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Corinthian and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

203. By reason of the above conduct, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act for the violations committed by Corinthian.

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.

Dated:   December 2, 2013

                                    Respectfully submitted,

                                    **POMERANTZ GROSSMAN HUFFORD
                                    DAHLSTROM & GROSS LLP**

                                    */s/ Murielle J. Steven Walsh*
                                    Murielle J. Steven Walsh
                                    Jeremy A. Lieberman
                                    Star Mishkel Tyner
                                    Lesley F. Portnoy
                                    600 Third Avenue, 20th Floor
                                    New York, New York 10016
                                    Telephone:  (212) 661-1100
                                    Facsimile:  (212) 661-8665
                                    jalieberman@pomlaw.com
                                    mjsteven@pomlaw.com
                                    smtyner@pomlaw.com
                                    lfportnoy@pomlaw.com

                                    ***Attorneys for Lead Plaintiff***

## CERTIFICATE OF SERVICE

I, Murielle J. Steven Walsh, hereby declare under penalty of perjury as follows:

I am over the age of eighteen.

On December 2, 2013, I electronically filed the foregoing FIRST AMENDED CLASS ACTION COMPLAINT with the Clerk of the Court via Federal Express Next Day mail service and using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on December 2, 2013.

/s/ Murielle J. Steven Walsh
Murielle J. Steven Walsh